IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | No. 29839-6-III |
| SUE SHAPIRO, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARTIN SHAPIRO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Martin Shapiro appeals several terms of the trial court's

dissolution of his 27-year marriage to Sue Shapiro. He challenges (1) the trial court's

distribution of property as inequitable because based upon a characterization of the

family home (acquired by him before marriage) as community property and because of

its allocation to him of the home in which the parties' daughter resides, (2) the trial

court's default finding of a community lien against the family home, (3) the court's

valuation of his separately owned business, and (4) an award of maintenance that he

alleges is excessive.

The trial court's characterization of the family home as community property fails

in light of the Washington Supreme Court's clarification of the law in its postdecree

decision in *In re Estate of Borghi*, 167 Wn.2d 480, 484-55, 219 P.3d 932 (2009) but its default finding of a community lien of 90 percent of the home's value is supported by substantial evidence. We reverse in part, with directions to the court to revise the decree to reflect Mr. Shapiro's separate ownership of the home and the community lien, and so that the court may amend the decree to reflect a modification of the maintenance award ordered by the court on reconsideration but not reflected in the existing decree. We otherwise affirm.[1]

## FACTS AND PROCEDURAL BACKGROUND

Martin and Sue Shapiro started dating in college in 1974. After graduating in 1976, Mr. Shapiro returned to Yakima and bought a one-bedroom home and acreage on Dahl Road for $14,000. Ms. Shapiro moved in with him following her graduation a year later. The parties were married in 1979 and have two adult children, Jessica and Amanda.

Mr. Shapiro had worked since a teenager in his family's business, Chicago Junk & Machinery Company, and returned to work for his father after graduating from college. Chicago Junk buys, processes, and resells scrap metals. It is located on six lots, one of which was given to Mr. Shapiro before the marriage and has always been held in his name.

---

[1] Both parties requested an award of attorney fees in connection with our commissioner's consideration of and ruling on a motion to strike filed by Mr. Shapiro early in the appellate process. The fee requests were referred to the panel. We deny both requests.

When Mr. Shapiro's father died in 1985, his interest in the business operation passed to Mr. Shapiro individually, but the five remaining lots on which the business was located passed to other members of Mr. Shapiro's family. For a couple of years following his father's death, Mr. Shapiro worked as a warehouse supervisor for Washington Fruit to supplement his and Ms. Shapiro's income while Ms. Shapiro assumed some of his responsibilities at Chicago Junk, so that they could generate the cash flow needed to keep the business running and buy the five lots from his family. They succeeded in purchasing the lots, which Chicago Junk thereafter rented from the marital community.

Mr. Shapiro's income from the business was the principal source of a comfortable living enjoyed by the parties during the marriage. Although the amount of salary that he drew varied over the years, there was testimony at trial that over its long history the business had paid an average of $97,000 a year to the owner. In the first five months of 2009 (the trial took place in July 2009) Mr. Shapiro had been paid $77,500 as officer's wages. At the time of trial, Mr. Shapiro was 56 years old. Report of Proceedings (RP) at 254.

Ms. Shapiro's undergraduate degree was in counseling. She worked as a teacher's aide before becoming pregnant with Jessica in 1979. After Jessica was born, she stayed home for a time but then began working part time outside the home in counseling and education-related positions. When her daughters were in their teens she earned her Master's degree in education with a guidance and counseling certification. She and

3

another teacher then started an alternative high school in the late 1990s where she worked for three years. In or about 2001, she quit working for a time and then started substitute teaching, which she continued to do until 2005.

Although she worked part time for much of the marriage and even more when her daughters had grown, Ms. Shapiro testified that her primary role had always been maintaining the household and supporting the children in their school and after-school activities. She also handled the household finances.

Ms. Shapiro had quit working by the time of the parties' separation in 2006 and did not work in the three years between then and the 2009 trial, other than to provide uncompensated baby-sitting for Jessica, who had three children. Jessica was attending school, and Ms. Shapiro baby-sat the children on the several days a week that Jessica had classes.

Ms. Shapiro's income at the time of trial consisted of $2,000 per month in temporary support being paid to her by Mr. Shapiro and $500 per month she was collecting in rent from Jessica. Her expectation for the next year was that she would continue to baby-sit the grandchildren while Jessica was in school and substitute teach part time, when Jessica did not need her to baby-sit. She testified that gross pay for substitute teachers was $100 per day. When questioned about her prospects for better-paying employment, she explained that she would be unable to teach full time without getting a teaching certificate, which she believed would take at least two years of

4

additional coursework. She believed that with a little more training, she could be a school counselor, but had not made any serious effort to look into that option. At the time of trial, Ms. Shapiro was 54 years old.

The parties owned nine substantial pieces of real property at the time of trial. The first was the home on Dahl Road that Mr. Shapiro had purchased on returning to Yakima after college graduation. In the 29 years the parties lived there before separating, what had started out as a one-bedroom home had been expanded, modified, and remodeled many times.

In 2004, Mr. Shapiro and Ms. Shapiro had refinanced their indebtedness on several properties into a single mortgage against the Dahl Road home. In connection with the refinance, Mr. Shapiro quitclaimed the Dahl Road home to "Martin S. Shapiro and Sue B. Shapiro, Husband and Wife," "for and in consideration of love and affection." Resp't's Ex. 38 (capitalization omitted). Notwithstanding the recited consideration, Mr. Shapiro testified that he conveyed the property into both parties' names at the lender's insistence, as a condition of the refinancing.

The value of the Dahl Road home at the time of trial was estimated to be $430,000 by Mr. Shapiro's appraiser and $455,000 by Ms. Shapiro's appraiser. The mortgage against the home at the time of the parties' separation was $280,140.46, but had been reduced to $224,660.30 by the time of trial.

The second substantial property acquired by the parties and owned at the time of their separation were the five lots of the Chicago Junk business property purchased from members of Mr. Shapiro's family. After the lots were acquired, leases had been prepared from the marital community to Chicago Junk and were producing $2,000 per month in rentals to the community at the time of trial. Testimony at trial estimated the value of the five community lots and Mr. Shapiro's separate, sixth lot to total $283,500.

In or about 2000, the couple bought what was referred to below as the 28th Avenue home, to hold as a rental property. Ms. Shapiro moved into the home when the parties separated. At the time of trial, it was owned free and clear. Ms. Shapiro valued it at $170,000 and Mr. Shapiro valued it at $175,000. RP at 73.

In 2001, Mr. Shapiro purchased 17 acres neighboring the Dahl Road home. He applied $22,000 that he had received from the sale of his mother's home, which was separate property, to the purchase price of $76,000. Before applying the cash bequest to the purchase, however, he deposited it to a joint account. When asked at trial whether he had intended to keep that money separate from his wife, he answered, "Not at the time." RP at 346. He improved the 17 acres with 9 acres of cherry trees and 800 to 1,000 Christmas trees, which cost about $10,000, meant for resale. The 17 acres was valued at $97,000 without the trees.

In 2002, the parties purchased a home on 23rd Avenue with a view to renting it to their daughters. At the time of trial, Ms. Shapiro was renting it to Jessica for $500 per month "because that's all [Jessica] could afford," although she acknowledged that the rental value was probably $1,200 per month. RP at 23. Mr. Shapiro had allowed Jessica to live there for a time rent free and advocated giving the home to the daughters, but Ms. Shapiro had insisted that Jessica pay something for rent. Mr. Shapiro had disclaimed the rent, saying it could go to Ms. Shapiro. The house was valued by the parties at $200,000.

The parties owned a home in Kauai, Hawaii. Mr. Shapiro placed its value at $623,000. CP at 43. It was subject to a mortgage at the time of trial of $319,304.75. Mr. Shapiro testified that he could no longer afford to make the payments.

The parties owned a cabin in Pleasant Valley, valued at $82,500.

They owned 80 acres in Umtanum Ridge worth roughly $60,000.

They owned a lot on Terrace Heights worth $8,000.

They owned rental mobile home properties on Naches Road that they agreed had a combined value of $90,000.

The major valuation dispute at the time of trial was over the value of Chicago Junk, of which Mr. Shapiro was the sole shareholder. The court heard valuation testimony from Mr. Shapiro; from Michael Moriarty, the certified public accountant who had done Chicago Junk's accounting work since 1978; and from Ms. Shapiro's valuation

7

expert, Mathew Petersen. Mr. Shapiro also offered and the court admitted the published deposition of Dean Rasmussen, a scrap metal buyer.

Mr. Petersen prepared his valuation for Ms. Shapiro as of year-end 2005, to reflect the value at the time of the parties' separation, after which she ceased to have any influence in the business. He worked through asset, income, and market approaches to value before selecting the income approach for his final conclusion of value, which was $827,000. The time frame of operations he analyzed was from 2001 to 2005, which he characterized as one business cycle. He used a weighted average because the company brought in more revenue in 2004 and 2005. His valuation was premised on a reasonable compensation rate to Mr. Shapiro of $62,000 per year.

Ms. Shapiro testified that in addition to the going concern value of the business, Mr. Shapiro had accumulated and set aside a large number of antiques, which he had always said they would sell and use for their retirement. She estimated their value as at least $10,000.

Mr. Moriarty was called as a witness by Mr. Shapiro and critiqued Mr. Petersen's valuation. He testified that the attribution of compensation to Mr. Shapiro of only $62,000 was unrealistically low, based on a historical average salary to the owners of $97,000. He criticized the time frame selected for analysis by Mr. Petersen as including two years (2004 and 2005) with exceptionally high, unrepresentative revenues. He challenged Mr. Petersen's assumptions about inventory turnover and competition,

expressing the view that Chicago Junk has no goodwill value. For that reason, and because commodity prices had fallen, he based his conclusion of value on the company's book value of $508,389 as of year-end 2005.

Mr. Rasmussen testified to the volatility of the scrap metal industry, the value of Chicago Junk's inventory, the strength of its competition, and his opinion that there was no market for scrap metal businesses.

Mr. Shapiro testified at trial that the business was struggling. He seconded testimony by Mr. Moriarty and Mr. Rasmussen about the scrap metal business. On cross-examination, however, he admitted having drawn the $77,500 in officer's wages in the first five months of 2009 and that he had paid each of his daughters $5,000 during the first quarter of 2009, a continuation of a pattern from 2008, when he paid each a total of $20,000. The money was paid for occasional work by Jessica and no work by Amanda, who no longer lived in the area.

Each party had a small IRA (individual retirement account) with values that appeared from exhibits and testimony to be roughly equal in value.

The trial court was presented with evidence of numerous other items of personal property and incidental real estate interests that it addressed in its findings, conclusions, and decree, but they are not in dispute on appeal.

Ms. Shapiro asked that both the Dahl Road home and Chicago Junk be characterized by the trial court as community property, identified her preferences as to

9

distributions of the parties' properties, and requested a maintenance award of $6,000 per month. She asked that a deadline not be placed on the maintenance award, explaining that she had assumed she would be married for the rest of her life.

Mr. Shapiro asked that the Dahl Road home and Chicago Junk be recognized as his separate property, identified his preferences as to distribution, and argued that Ms. Shapiro's maintenance should be substantially limited given her education, qualifications, and additional years of potential gainful employment.

At the conclusion of what proved to be a four-day trial, the court took the extensive evidence submitted by the parties under advisement. It convened the parties for an oral ruling several weeks later and entered complete findings of fact and conclusions of law thereafter.

The court found that the parties owned, among others, the following community property assets, having the following values net of encumbrances:

| | |
|---|---|
| Dahl Road home and acreage | $165,000 |
| 28th Avenue home | $172,500 |
| 23rd Avenue home | $200,000 |
| Kauai home | $279,249 |
| Community business lots (5 of 6) | $196,875 |
| Pleasant Valley cabin | $82,500 |
| Naches Road properties | $90,000 |
| Umtanum Ridge property | $60,000 |
| Terrace Heights property | $8,000 |

CP at 50-55.

It found that one or the other owned, among others, the following separate property assets, having the following values net of encumbrances:

| MR. SHAPIRO | |
|---|---|
| Chicago Junk | $827,000 |
| Business lot acquired before marriage | $39,375[2] |
| Dain Rauscher IRA | $38,438 |
| TOTAL: | $904,813 |

| MS. SHAPIRO | |
|---|---|
| Dain Rauscher IRA | $37,212 |
| TOTAL: | $37,212 |

*Id.*

It awarded the community property as follows, and with the following values:

| MS. SHAPIRO | | MR. SHAPIRO | |
|---|---|---|---|
| 28th Avenue home | $172,500 | Dahl Road home and acreage | $165,000 |
| Kauai home | $279,249 | 23rd Avenue home | $200,000 |
| Pleasant Valley cabin | $82,500 | Naches Road | $90,000 |

---

[2] Neither in its oral ruling nor in its findings and conclusions did the trial court place a value on the business lot that was Mr. Shapiro's separate property. We have assumed that each of the business lots had an equal value in arriving at a value of $39,375 for the separate property lot. The value could be as high as $86,625, however, given the difference between the value placed on the community lots ($196,875) and the testimony at trial as to the total value of all six lots ($283,500). The $47,250 difference makes no difference to any issue on appeal.

11

| | | | |
|---|---|---|---|
| Umtanum Ridge | $60,000 | Business lots (community portion) | $196,875 |
| Terrace Heights | $8,000 | | |
| TOTAL: | $602,249 | | $651,875 |

Considering the foregoing community property distributions and the parties' separate properties, Mr. Shapiro was left with a total of $1,556,688 in value of assets ($651,875 community, $904,813 separate), while Ms. Shapiro was left with a total of $639,461 in value ($602,249 community, $37,212 separate). In light of the discrepancy, the court ordered that Mr. Shapiro make a transfer payment of $250,000. It ordered that the payment be made over 10 years and bear interest at a rate of 5 percent, and that it be secured by a deed of trust on the Dahl Road property. The resulting obligation was made payable by the decree at $2,651 a month.

When it came to Ms. Shapiro's maintenance request, the court concluded that Mr. Shapiro's continual employment had positioned him to earn $15,000 per month in salary and that distributing income-producing properties to him would leave him with a $2,000 per month lease payment from Chicago Junk, $600 per month rent from the Naches Road properties, and $500 per month rent from the 23rd Avenue house, totaling $18,100 in income per month. The court determined that Ms. Shapiro could earn $1,500 per month as a substitute teacher and was qualified as a counselor, but that no evidence had been

presented of her potential salary as a counselor. The court ordered maintenance payments of $4,500 a month, to continue until Mr. Shapiro retires or turns 67, whichever is later. It ordered that 25 percent of Mr. Shapiro's eventual Social Security benefit be allocated to Ms. Shapiro.

A motion for reconsideration was denied. Mr. Shapiro appeals.

## ANALYSIS

Mr. Shapiro challenges the court's characterization of the Dahl Road home as community property, the amount and basis of its default community lien against the Dahl Road home, its distributing to him the 23rd Avenue home in which the parties' daughter lives, the value placed on Chicago Junk, and the amount and term of the maintenance award to Ms. Shapiro. We address the challenges in turn.

### I. Characterization of Dahl Road Home

In a marriage dissolution action, the trial court is required to make a disposition of the parties' property and liabilities that is "just and equitable" after considering "all relevant factors including, but not limited to: (1) [t]he nature and extent of the community property; (2) [t]he nature and extent of the separate property; (3) [t]he duration of the marriage or domestic partnership; and (4) [t]he economic circumstances of each spouse or domestic partner at the time the division of property is to become effective." RCW

13

26.09.080.[3] The discretion given the trial court is broad and we will reverse only upon a showing of a manifest abuse of discretion. *In re Marriage of Kraft*, 119 Wn.2d 438, 450, 832 P.2d 871 (1992).

In order to apply all the relevant factors, the court must first characterize the marital property as either community or separate. *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002). Its characterization of property as either separate or community is a question of law subject to de novo review. *Id.*

The trial court characterized the Dahl Road home as community property. Anticipating a challenge on appeal, it found that if the Dahl Road home were determined to be separate property, it would award a community lien of 90 percent of its value based on community contributions. Mr. Shapiro challenges both findings. We first address his challenge to the trial court's characterization of the Dahl Road home as community property.

The character of the property is established at the time of its acquisition. *In re Estate of Borghi*, 141 Wn. App. 294, 297, 169 P.3d 847 (2007), *aff'd*, 167 Wn.2d 480. Once evidence reveals that property is separate in character, it maintains its distinction until the party challenging the asset's character provides direct and positive evidence

---

[3] We quote the current version of RCW 26.09.080, which was amended by Laws of 2008, chapter 6, section 1011 to make the language gender neutral and to include domestic partners.

that proves otherwise. *In re Estate of Dewey*, 13 Wn.2d 220, 226-27, 124 P.2d 805

(1942) (quoting *Guye v. Guye*, 63 Wash. 340, 352, 115 P. 731 (1911)). The term

"direct and positive evidence" equates to a "clear and convincing evidence" standard.

*Borghi*, 167 Wn.2d at 484-85 n.4. When real property is at issue, an acknowledged

writing is generally required to change the separate status of the real property to

community property. *In re Estate of Verbeek*, 2 Wn. App. 144, 156-58, 467 P.2d 178

(1970).

The evidence was undisputed that Mr. Shapiro purchased the Dahl Road home

before marriage and its character began as separate. But at the time of trial and the trial

court's entry of its findings, conclusions, and decree, two cases—*In re Marriage of Hurd*,

69 Wn. App. 38, 848 P.2d 185 (1993) and *In re Marriage of Olivares*, 69 Wn. App. 324,

848 P.2d 1281 (1993)—had been broadly read to provide that where title to separate

property was later placed in the name of both spouses, a presumption is permitted that the

transaction was intended as a gift to the community. *Borghi*, 167 Wn.2d at 487. The

presumption of a gift to the community could only be overcome by clear and convincing

evidence.

In light of this precedent, the trial court concluded that while the home started out

as Mr. Shapiro's separate property, "[he] voluntarily deeded the property to the marital

community" and that "[the] property on Dahl Road is community property." CP at 50.

15

The court also observed that the community had taken on the consolidated debt on the Dahl Road home.

Attempting to persuade the trial court otherwise, Mr. Shapiro's lawyer had argued throughout trial that a challenge to the holding of *Hurd* was awaiting decision by the Washington Supreme Court in *Borghi*. With this argument apparently in mind, the trial court's findings and conclusions contained the following default finding of a community lien:

> If this matter is appealed and the Court of Appeals decides differently the Court makes the following additional comments: The value of the land is $60,000.00 and the house is worth $385,000.00. The house started out quite small. Substantial improvements and additions were made. In the event the Court of Appeals decides it still [sic] Husband's separate property the trial Court finds that the community has a lien for 90% of the house value and the land would be the Husband's separate property. This is only in the event of an appeal.

CP at 50-51.

Thereafter, in November 2009, the Supreme Court issued its decision in *Borghi*. The four-member lead opinion disapproved *Hurd* and *Olivares*, holding that "even when a spouse's name is included on a deed or title at the direction of the separate property owner spouse, this does not evidence an intent to transmute separate property into community property but merely an intent to put both spouses' names on the deed or title." 167 Wn.2d at 489. It observed, "There are many reasons it may make good business sense for spouses to create joint title that have nothing to do with any intent to create

16

community property." *Id.* The opinion reiterated what it characterized as the "well-settled rule" that no presumption arises from the names on a deed or title and held that clear and convincing evidence was required to overcome the presumption that the property remained separate. *Id.* at 490-91. The concurring opinion required for a majority agreed, except to say that the facts presented did not require the court to decide what type of evidence is sufficient to overcome the separate property presumption. *Id.* at 492 (Madsen, J., concurring).

At best, Ms. Shapiro's evidence established that the parties' mortgage obligations were combined to save money and that Mr. Shapiro entered into the refinancing willingly, knowing that a transfer of title to the Dahl Road home would be required. Mr. Shapiro's testimony that he executed the quitclaim deed only to secure the refinancing, not to change the separate character of the property, was essentially undisputed. Given the presumption that the separate character of the property continued, no presumption from the transfer of title, and the dearth of any evidence (apart from the deed) that Mr. Shapiro intended to make a gift to the community, the trial court erred in characterizing the Dahl Road home as community property. Given undisputed testimony as to the enlargement and improvement of the home during the 27-year marriage, however, there was an issue as to the existence and extent of a community lien.

17

## II. Amount of the Community Lien

The default community lien found by the trial court was for 90 percent of the value of the Dahl Road home. It found the original home property to have a value of $385,000 and the 17 acres acquired later to have a value of $60,000. Although the court was not explicit about how the encumbrance was to be handled, we assume that it intended the community and separate interests to bear an aliquot portion of the debt. Applying the debt ratably to each interest results in the community having a $128,478 net interest in the home property and a $22,247 net interest in the acreage, and Mr. Shapiro having a separate $14,275 net interest in the home property.[4]

Mr. Shapiro argues first that the increase in value of the Dahl Road home is presumed to be separate and Ms. Shapiro has not provided evidence of the investment of community funds or labor needed to rebut the presumption. Second, he argues that Ms.

---

[4] The combined value placed on the Dahl Road home and adjacent acreage is lower than the appraised values presented at trial. The encumbrance amount is within the range of evidence presented on its amount at the time of the parties' separation. Given the knowns—(1) that the court valued the acreage at $60,000, the home property at $385,000, and the 90 percent community interest in the home property at $346,500, *see* CP at 50, 94; and (2) that it valued the acreage and home property together, net of encumbrances, at $165,000, *see* CP at 50—it necessarily treated the encumbrance amount as $280,000 ($445,000 total value minus $165,000). Allocating the total net value of $165,000 to the gross values of $60,000 for the acreage, $346,500 for the community interest in the home property, and $38,500 for Mr. Shapiro's separate interest in the home property yields the net values of $22,247 (acreage), $128,478 (community interest), and $14,275 (separate interest). ($22,247 + $128,478 + $14,275 = $165,000.)

Shapiro's benefit from living rent free in the residence offsets any right of reimbursement to the community.

Where a spouse presents direct and positive evidence that the increase in the value of separate property was attributable in part to community funds or labor, the community has a right of reimbursement and the court may impose a lien for its contribution to the separate property. *In re Marriage of Elam*, 97 Wn.2d 811, 816, 650 P.2d 213 (1982); *In re Marriage of Miracle*, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984).

The court may determine the value of community contributions by either determining a reasonable wage or assessing the resulting increase in value. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 869, 855 P.2d 1210 (1993) (citing Harry M. Cross, *The Community Property Law in Washington*, 61 WASH. L. REV. 13, 71 (1986)). We review a trial court's decision to grant a community lien for an abuse of discretion. *In re Marriage of Marshall*, 86 Wn. App. 878, 882, 940 P.2d 283 (1997).

In explaining in its oral decision why it would impose a default community lien if the home were determined not to be community property, the court commented on the extent of the transformation to the Dahl Road home:

> [T]he house started off when it was originally purchased by the husband was quite small. There were a number of expansions of the house. By the time we got to the present status of the house, it was unrecognizable as being the same house as the husband started off with.

CP at 94.

The court's observation was based on substantial evidence. Several pictures of the condition of the home when Ms. Shapiro moved in were admitted into evidence. They reveal a tiny home, the exterior of which, at least (there being no pictures of the interior), is in dilapidated condition. The home is not fenced and there is no landscaping to speak of.

Also admitted were a number of pictures of the home at the time the parties separated. They reveal a completely different, vastly larger home, fenced, apparently in good condition, fully landscaped, and with a swimming pool area. Both parties testified that they put a great deal of labor into the additions and improvements, as did family members and friends. They mortgaged the property several times to pay for renovations and other properties, and throughout the marriage paid the mortgage with community funds. Both parties' appraisals valued the home property at the time of separation at $430,000 or more.

It is true that Ms. Shapiro did not provide dollar figures for the cost of the improvements or the increase in value. Mr. Shapiro argues that the lack of numeric support in the trial court's findings for the 90 percent allocation requires that we reverse the trial court's finding of a right of reimbursement and equitable lien. Yet from the pictures alone, it would be an injustice not to recognize that the lion's share of the value of the house is the result of its transformation during the marriage. The pictures are not only direct and positive evidence, they call for a substantial community lien beyond a

20

reasonable doubt. While cost information would have been helpful, it is understandable that it was not available given the 27-year passage of time, the parties' testimony that the improvements took place in many stages, and the unforseeability to Ms. Shapiro of having to prove the time and material invested in a future dissolution proceeding. The pictures and the testimony of the parties was the best evidence of the general magnitude of the improvements. They support the trial court's finding that the community is entitled to a right of reimbursement and equitable lien in an amount equal to 90 percent of the value of the home property.

Mr. Shapiro next argues that the court should have offset the community's right of reimbursement and lien to account for Ms. Shapiro's opportunity to live in his separate property, relying on *Miracle*, 101 Wn.2d at 139. In that case, the parties lived in a home that was the separate property of the wife during six years of their seven-year marriage. The community made no improvements to the home. But both parties deposited their income—including the wife's separate rental income from another property she owned—into a joint account; from that account the wife made payments of $124 to $151 a month toward her purchase contract for the home in which the parties lived. When the parties divorced, the husband asked for a right of reimbursement to the extent of real estate contract payments made from the joint account. The trial court refused, concluding that the payments were more than offset by a benefit to the community in the form of the $250 to $300 a month rental value of the home.

21

The outcome in *Miracle* turned on the abuse of discretion standard. The court held that "[t]he trial court *may* impose an equitable lien to protect the reimbursement right when the circumstances require it." 101 Wn.2d at 139. Given the offsetting benefit to the husband, it respected the trial court's exercise of its discretion not to impose a lien.

The outcome in *Miracle* is inconsistent with a number of other cases involving community improvements to separate property, as Professor Harry Cross observed in the last of his surveys of Washington community property law, citing, in particular, *Elam*. He characterized *Elam* as "like most other marriage dissolution cases in that [in *Elam*] there is no indication that argument was made that reimbursement had already been made, or that the contribution was a gift, or that reciprocal benefit was provided, or that there was some other basis for concluding an equitable lien should be denied." Cross, *supra*, 61 WASH. L. REV. at 70 n.292. A trial court is not required to offset the community lien with a claimed benefit if it is not fair and equitable. Mr. Shapiro has not shown that the trial court abused its discretion in finding no offsetting benefit here.

When we modify the trial court's distribution of property to reflect the separate character of the Dahl Road home and the community lien, it makes very little difference to the value of community property distributed to each party. Thus revised, the court's default finding was that the parties owned, among others, the following community property assets, having the following values net of encumbrances:

| | |
|---|---|
| Community lien, Dahl Road home | $128,478 |
| Dahl Road acreage (17 acres) | $22,247 |
| 28th Avenue home | $172,500 |
| 23rd Avenue home | $200,000 |
| Kauai home | $279,249 |
| Community business lots (5 of 6) | $196,875 |
| Pleasant Valley cabin | $82,500 |
| Naches Road properties | $90,000 |
| Umtanum Ridge property | $60,000 |
| Terrace Heights property | $8,000 |

CP at 50-55.

As revised, the parties owned, among others, the following separate property assets, having the following values net of encumbrances:

MR. SHAPIRO

| | |
|---|---|
| Dahl Road home net of community lien | $14,275 |
| Chicago Junk | $827,000 |
| Business lot acquired before marriage | $39,375 |
| Dain Rauscher IRA | $38,438 |
| TOTAL: | $919,088 |

MS. SHAPIRO

| | |
|---|---|
| Dain Rauscher IRA | $37,212 |
| TOTAL: | $37,212 |

*Id.*

23

As corrected, the value of the community property awarded to the parties is as follows:

| MS. SHAPIRO | | MR. SHAPIRO | |
|---|---|---|---|
| 28th Avenue home | $172,500 | Dahl Road acreage and community interest, Dahl Road home | $150,725 |
| Kauai home | $279,249 | 23rd Avenue home | $200,000 |
| Pleasant Valley cabin | $82,500 | Naches Road | $90,000 |
| Umtanum Ridge | $60,000 | Business lots (community portion) | $196,875 |
| Terrace Heights | $8,000 | | |
| TOTAL: | $602,249 | | $637,600 |

The community property distribution is closer to fifty-fifty with this adjustment. Considering the parties' separate property, their positions remain unchanged. Mr. Shapiro was left with $1,556,688 in value of assets ($637,600 community, $919,088 separate), while Ms. Shapiro was left with $639,461 in value ($602,249 community, $37,212 separate).

### III. Distribution of 23rd Avenue Home

Mr. Shapiro's next argument why the distribution of assets is inequitable is that the court abused its discretion in awarding him the 23rd Avenue home in which Jessica

24

was living and paying below-market rent. Relying on the fact that he was already paying its mortgage and his contention that both parties wanted the home gifted to their daughter, he asks us to order the trial court to either award the house to Ms. Shapiro for $150,000, award it to him for the reduced amount of $150,000, or charge neither party and gift the home to the daughter jointly. The record does not support his characterization of Ms. Shapiro's position; while she wanted the daughters to have the home, she did not believe it should be "given" to them. The court's rationale in awarding the 23rd Avenue home to Mr. Shapiro was that he could make the choice whether or not to give it to the daughters.

The court was required to distribute the property to Mr. Shapiro or Ms. Shapiro and award it based on its fair market value, which the parties agreed was $200,000. The parties were left with roughly equal distributions of community property, although Mr. Shapiro received more in value both originally and as corrected. This is precisely the type of judgment best made by the trial court. Mr. Shapiro has not shown any abuse of discretion.

IV. Value of Chicago Junk

Mr. Shapiro next argues that the trial court placed too high a value on Chicago Junk. The trial court sided with Mr. Shapiro in denying Ms. Shapiro any community interest or right of reimbursement from Chicago Junk for the work she performed over

25

the years.[5]  The $827,000 value placed on the business as Mr. Shapiro's separate property was nonetheless important to the trial court's overall disposition.  All of the parties' property, both community and separate, was before the court for distribution. *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972).  The significantly higher value of separate and community property that Mr. Shapiro was left with following the marriage was considered by the court in ordering the $250,000 transfer payment.

"[W]hen the parties offer conflicting evidence in valuation, the court may adopt the value asserted by either party or any value in between the two." *In re Marriage of Rockwell*, 141 Wn. App. 235, 250, 170 P.3d 572 (2007).  A court's valuation of an asset that is within the scope of evidence will not be disturbed on appeal. *In re Marriage of Mathews*, 70 Wn. App. 116, 122, 853 P.2d 462 (1993).

Mr. Shapiro expresses concern that in adopting Mr. Petersen's valuation, the trial court failed to recognize that he had presented evidence of lower values through the testimony of Mr. Moriarty and Mr. Rasmussen.  The record reveals, however, that Mr. Shapiro's evidence was effectively presented and the trial court was actively engaged in ruling on objections and asking its own questions.  There is no basis for questioning the

---

[5] Ms. Shapiro's response brief argues that the trial court should have recognized her right to reimbursement and ordered an equitable lien against the business, but she has not cross appealed.  We will not consider the argument.

trial court's attention to and understanding of the evidence. Nor is there any reason to believe that the court overlooked the deposition of Mr. Rasmussen; Mr. Shapiro's lawyer mentioned Mr. Rasmussen's testimony several times in closing argument at the time of trial and raised his testimony again in moving for reconsideration.

Mr. Shapiro also argues that the business should have been valued as of 2009 rather than 2005 but Washington cases recognize the trial court's broad discretion to designate a valuation date that is equitable. *Lucker v. Lucker*, 71 Wn.2d 165, 168, 426 P.2d 981 (1967). Here, the rationale of Ms. Shapiro's expert, Mr. Petersen, was that the date of separation was used because Ms. Shapiro had no ability to influence the business after that date. Notably, Mr. Shapiro's expert, Mr. Moriarty, used the same date in offering book value as the appropriate measure of value.

Mr. Shapiro's evidence was effectively presented. It was countered by Ms. Shapiro's presentation of the valuation opinion of Mr. Petersen. We do not reweigh the evidence. Because the court's valuation of Chicago Junk falls within the scope of the evidence, we will not disturb it.

## V. Maintenance Award

Mr. Shapiro finally contests the trial court's maintenance award, claiming (1) he cannot afford to pay it, (2) Ms. Shapiro was demonstrably able to pay her monthly expenses on less during the period of separation, and (3) insufficient consideration was given to Ms. Shapiro's obligation to seek gainful employment. He also argues that the

duration of the maintenance award is too long and that an agreement by the trial court to shorten the duration and clarify Ms. Shapiro's interest in his future Social Security benefit has never been reduced to an amended decree.

The trial court's decree awards Mr. Shapiro "75% of any and all social security earned by him either [sic] during the marriage" and awards Ms. Shapiro "25% of Husband's social security retirement," to be paid to her "[c]ommencing the month following the termination of maintenance . . . to be paid to Wife until Wife's remarriage, cohabitates with another person or the death of either party." CP at 65, 67. Addressing maintenance, the decree provides "maintenance shall be paid at the rate of $4500.00 a month until Husband turns 67 or retires; whichever is later," adding that the maintenance obligation similarly terminates upon the death of either party or Ms. Shapiro's cohabitation or remarriage. CP at 60.

Mr. Shapiro challenged aspects of the maintenance award in a motion for reconsideration. At the May 2010 hearing on his motion, the trial court orally agreed to three clarifications or modifications that have so far not been memorialized in an amended decree. It first clarified the Social Security term, stating "I was not saying that I was granting Ms. Shapiro an interest in Mr. Shapiro's Social Security. What I was saying was the amount of maintenance that he would be paying would be calculated based upon the amount of his Social Security." CP at 375. Upon being advised that Ms. Shapiro could be entitled to a Social Security benefit of more than 50 percent of Mr. Shapiro's

benefit, the court explained, "[M]y intent was basically to even out the Social Security

benefits that they would get," and that if her benefit was more than 50 percent of Mr.

Shapiro's benefit "then the amount that he would pay would be determined by one-half of

the difference between the Social Security that they were each entitled to." CP at 376.

The court finally agreed to adjust the termination date for maintenance, stating:

> THE COURT: . . . My problem was I—with the nature of his business it might be hard to figure out when he's retiring because he could just be semi-retired and maybe go into the office three times a week or two times a week . . . . I'll change it slightly—it just goes until he's 67 and if he continues to work after that and doesn't retire, it ends when he's 67. The $4,500.00 ends when he's 67.
> [MR. SHAPIRO'S LAWYER]: So it would be retire at 67. The 67 is the last available date.
> THE COURT: It goes until he's 67. The $4,500.00 does, and after that the maintenance continues at a rate that is one-half of the difference between the Social Security payments to which they would be entitled at that time.

CP at 380.

An order on the motion for reconsideration was not presented until almost a year

after the hearing. Although Ms. Shapiro had been directed to present an order, the

belated order was presented by Mr. Shapiro, evidently to enable him to file a notice of

appeal. The order entered indicates that the motion for reconsideration was denied. The

parties may have forgotten that the trial court had agreed to the three clarifications or

modifications discussed above.

Mr. Shapiro appears to be entitled to an amended decree on these three issues, not

29

as a matter of appeal, but as a housekeeping matter in the trial court. Upon issuance of the mandate, the trial court will be free to amend the decree accordingly.

We turn, then, to Mr. Shapiro's argument that the maintenance is excessive.

RCW 26.09.090[6] provides that a court may grant a maintenance order for either spouse in a dissolution proceeding "in such amounts and for such periods of time as the court deems just, without regard to misconduct," after considering all relevant factors, including six statutory factors.[7] The court is governed strongly by the need of one party and the ability of the other party to pay an award. *In re Marriage of Foley*, 84 Wn. App. 839, 845-46, 930 P.2d 929 (1997) (citing *Endres v. Endres*, 62 Wn.2d 55, 56, 380 P.2d 873 (1963)). Yet a maintenance award "is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). The paramount concern in determining maintenance awards is the economic condition in which the dissolution decree leaves the parties. *Id.* at 181. "In a long term

---

[6] We quote the current version of RCW 26.09.090, which was amended by Laws of 2008, chapter 6, section 1012 to make the language gender neutral and to include domestic partners.

[7] The statutory factors considered are (1) the financial resources of the party seeking maintenance; (2) the time necessary for the party seeking maintenance to acquire education and training to find employment; (3) the standard of living during the marriage; (4) the duration of the marriage; (5) the age, physical and emotional condition, and the financial obligations of the party seeking maintenance; and (6) the ability of the party against whom maintenance is being sought to pay support. RCW 26.09.090; *In re*

marriage of 25 years or more, the trial court's objective is to place the parties in roughly equal financial positions for the rest of their lives." *Rockwell*, 141 Wn. App. at 243.

We review a maintenance award for abuse of discretion. *In re Marriage of Zahm*, 138 Wn.2d 213, 226-27, 978 P.2d 498 (1999). The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just. *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994).

The trial court's original oral decision, its findings and conclusions, and its oral ruling on Mr. Shapiro's motion for reconsideration make clear that it considered all of the relevant factors, including the statutory factors. Mr. Shapiro nonetheless argues that the court gave inadequate consideration to his ability to pay and to Ms. Shapiro's need, pointing to his historic expenses and the small amount of temporary maintenance on which Ms. Shapiro lived during the period of the parties' separation.

It is unreasonable for Mr. Shapiro to suggest that the trial court should have been guided by Ms. Shapiro's temporary maintenance award. During the separation, Mr. Shapiro was receiving most of the income from the community's rental properties and paying most of the community liabilities. It was to be expected—and is a fact—that with the distribution of the properties, Ms. Shapiro is now responsible for expenses that were

---

*Marriage of Foley*, 84 Wn. App. 839, 845, 930 P.2d 929 (1997).

previously paid by Mr. Shapiro. In addition, during the period of separation, Ms. Shapiro proved unable to meet any extraordinary expenses; she had to turn to Mr. Shapiro and her family members for help whenever such expenses arose. Even before taking into account the increase in her expenses, then, the temporary support amount had been inadequate. Finally, the temporary support amount never took into consideration the amount required to place the parties to this long-term marriage in roughly equal financial positions for the rest of their lives.

The trial court more properly looked at what the parties could reasonably be expected to earn and then balanced Ms. Shapiro's lesser historic monthly expenses with her entitlement to be left with a reasonable standard of living.

The evidence was undisputed that while Ms. Shapiro had education, work experience, and skills, the periodic and part-time nature of her work and the parties' reliance on her as the primary caretaker on the home front left her relatively unable to support herself in the manner to which she and her husband had become accustomed. While Mr. Shapiro stressed her qualifications and her failure to seriously pursue more gainful employment, Ms. Shapiro stressed the obstacles she faced as a woman in her mid-50s who had been out of the full-time workplace for decades.

The trial court did impute reasonable income to Ms. Shapiro, contrary to Mr. Shapiro's argument that it failed to require her to contribute to her own support. It imputed $1,500 a month in income. At the rate of pay for substitute teaching testified to

32

at trial, the imputed income requires that she substitute teach for 180 days a year. One hundred eighty days amounts, essentially, to a full school year. *Cf.* RCW 28A.150.220 (providing that each school district shall make available to students an annual average total instructional hour offering of at least 1,000 hours; at 5.5 hours a day, 1,000 hours amounts to 180 days); former WAC 180-16-215 (2002) (providing that each school district shall conduct a school year of no less than 180 school days).

Taking into consideration the parties' respective incomes and the total $7,151 a month that Mr. Shapiro will pay to Ms. Shapiro for the 10-year term of the transfer obligation ($4,500 in maintenance and $2,651 in transfer payment installments), Mr. Shapiro is left with $10,949 in net monthly income to apply to his expenses while Ms. Shapiro is left with $8,651 in net monthly income to apply to hers.

Given the number of expenses formerly borne by Mr. Shapiro for which Ms. Shapiro became responsible following the distribution of properties, we cannot say that the trial court abused its discretion in fixing the maintenance amount.[8] It did not abuse its discretion in rejecting Mr. Shapiro's argument that Ms. Shapiro should sell some of the

---

[8] Mr. Shapiro provided his own analysis of the parties' respective monthly expenses during the period of separation as an appendix to his brief. We will not parse it because we reject its implicit premise that Ms. Shapiro should continue to get by on a small fraction of the community's historic income just because she led a hand-to-mouth existence during the separation. We do note that his analysis treats his income as a gross amount, with an adjustment for taxes, while treating Ms. Shapiro's imputed income as net. We find no basis in the record for the discrepancy. He also claims farm expenses for his 17 agricultural acres without recognizing any corresponding farm income.

community assets she received to meet her income needs so that he can maintain his own level of expenditures without having to sell any community asset distributed to him.

The trial court was in the best position to determine the maintenance award. Its award falls within the range of its discretion.

We reverse the trial court's characterization of the Dahl Road home as community property and remand the case with directions to the trial court to (1) correct its decree to reflect the separate character of the Dahl Road home and the community lien and (2) to entertain an amended decree addressing the three matters relating to the maintenance award that it appears to have agreed to clarify or modify at the hearing on the motion for reconsideration. On the remaining issues raised by the appeal, we affirm.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Culp, J.P.T.

34