## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Marriage of: | No. 47937-1-II |
| VICTOR K. CHENG, | |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| JULIA A. CHENG, | |
| Respondent. | |

MAXA, A.C.J. – Victor Cheng appeals the trial court's orders on spousal maintenance, property distribution, and child support in the dissolution of his marriage to Julia Sun.[1]  Although both Victor and Julia are highly educated, during much of their marriage Victor worked while Julia stayed home to raise their three children.  Victor owned a consulting business called Fast Forward Media (FFM), which in the few years before the Chengs separated had become very profitable.  In 2013, FFM distributed over $927,000 in income to Victor.

The trial court awarded FFM to Victor and valued it at $3.6 million.  The trial court divided the marital property equally, including awarding half of FFM's value to Julia.  The trial

---

[1] Julia changed her last name from Cheng to Sun after the parties' divorce.  For convenience, we refer to each party by their first name individually and the "Chengs" to indicate their martial union.  No disrespect is intended.

court also awarded Julia a total of $640,000 in spousal maintenance over 44 months, a judgment for $1.455 million at six percent interest paid over 15 years to equalize the property distribution, and child support above the standard calculation to reflect the family's standard of living.

Regarding maintenance and property distribution, we hold that (1) Julia's maintenance award based on Victor's FFM income does not duplicate her award of half of FFM's value, (2) the trial court did not abuse its discretion in ordering Victor to pay six percent interest on his deferred property payments, and (3) Victor was not entitled to receive credit in the property distribution for either his post-separation pension or income tax payments. Regarding child support we hold that (1) the trial court erred in not treating the interest Julia will receive from Victor's deferred property payments as income for child support purposes but did not err in declining to impute income to Julia or declining to allow Victor to deduct interest payments and pension payments from his income, and (2) the trial court's findings are insufficient to award child support above the standard calculation.

Accordingly, we affirm the trial court's maintenance and property distribution orders, but we reverse the trial court's refusal to include interest Julia will receive from Victor in the calculation of Julia's income for child support purposes and the award of child support above the standard calculation. We remand to the trial court for reconsideration of the appropriate child support award after including interest in Julia's income and considering whether the evidence is sufficient to award child support above the standard calculation.

FACTS

*Victor and Julia's Marriage*

Victor and Julia started dating as students at Stanford University. After graduating in 1995, they moved to New York City. They were married in 1996.

Both Victor and Julia worked various jobs in and around New York City. Julia struggled to find the right fit and eventually enrolled at Harvard Business School. She graduated in 2002, and the Chengs then relocated to the San Francisco area.

While the Chengs lived in California they struggled financially. They had their first child in 2003, and then had two more children in 2007 and 2009. Victor lost his job shortly after they moved and he began attending business workshops and training programs in an attempt to start his own company. Julia did not seek work, and focused on caring for the children and taking care of the home. The family moved to Bainbridge Island in 2010.

*Fast Forward Media*

Beginning in 2009, Victor started focusing on FFM, a consulting and distance learning company he had founded in 2002. FFM has two components: a management consulting service for small business clients and a distance learning company that sells products and services to recent graduates seeking employment in the management consulting industry. The second component, known as "case interview," makes up the larger part of FFM.

In the last several years, FFM has grown considerably. Victor now is a recognized expert in the field. FFM's gross revenues increased from $275,000 in 2009 to $1.545 million by 2013. Victor had income of $942,738 in 2013, almost all from FFM. He testified that FFM's 2014 revenue likely would be about the same as in 2013.

*Separation and Trial*

Victor and Julia separated on July 31, 2013, and Victor filed a petition for dissolution in

August. The case went to trial, which lasted 17 days. The primary issues were Julia's request

for maintenance, the division of community property, child support, and residential time for the

three children.

*Property Distribution*

The Chengs both presented evidence regarding their community assets, which consisted

primarily of FFM and their Bainbridge Island house. The trial court determined that the assets

should be divided equally.

A key issue was FFM's value. The trial court found that FFM "has significant goodwill

and profits, has experienced significant growth and will, more likely than not, continue to enjoy

significant growth in the near future." Clerk's Papers (CP) at 726. Victor and Julia both

presented expert testimony on value. Both of their experts used the capitalization of excess

earnings method, which determined FFM's value by projecting FFM's future income;

subtracting Victor's replacement income,[2] other operating expenses and estimated taxes; and

applying a capitalization rate. The trial court considered the experts' opinions and split the

difference, finding that the value of FFM was $3.6 million.

The trial court awarded 50 percent of FFM's value to Julia. The trial court also awarded

Julia the family's Bainbridge Island house, which had equity of $513,000. Because FFM made

---

[2] Replacement income is the market wage for an owner's services. Victor's expert believed that Victor's replacement income was $300,000. Julia's expert believed that replacement income was $245,000. The court found the number provided by Julia's expert to be more credible.

up such a large portion of the Chengs' assets and because Victor was unable to immediately pay Julia's interest in the company, the trial court determined that Victor should make payments to Julia over a 15-year period with six percent interest. This resulted in a $12,279.42 monthly payment for Victor, a significant portion of which was interest.

*Spousal Maintenance*

Julia requested maintenance of $25,000 per month for eight years while Victor suggested $10,000 per month for two years. The trial court noted that Julia had not been employed since quitting to attend business school, her job skills were outdated, and she had applied to numerous jobs without success. But the trial court also found that Julia was "highly educated, intelligent, talented and creative, and she should be able to secure employment within a reasonable amount of time." CP at 731. Specifically, the trial court found that Julia could obtain a job earning at least $80,000 and potentially over $100,000 after two years, and allowed her a year or two to obtain the necessary retraining.

The trial court awarded Julia monthly maintenance of $20,000 for eight months, $15,000 for the next two years, and $10,000 for another year. The trial court expressly rejected as a matter of law Victor's argument that awarding both maintenance and half of FFM's value to Julia provided Julia with double recovery.

*Credit for Post-Separation Pension and Tax Payments*

In a pretrial order, the trial court – a different judge than the trial judge – had required Victor to pay outstanding FFM pension obligations and the community's income tax debts. At that time, the trial court indicated that Victor would receive credit for the payments. The

5

payments were made as required, but the trial court did not give Victor credit for these payments in the final property division.

*Child Support*

The trial court ruled that the children would reside primarily with Julia while having significant residential time with Victor. Regarding child support, the trial court ruled that support should exceed the maximum level provided in the child support schedule because of the lifestyle the children had enjoyed. The trial court made the following finding:

> Both parents provided financial declarations indicating extraordinary expenditures on the children. (Exhibits 22 and 402). Ms. Cheng testified at length about the children's expenses, including private school tuition and special needs expenses for [their oldest daughter]. (Exhibit 403) The children have experienced a lifestyle that includes frequent meals at expensive restaurants, an organic diet that is financially beyond the scope of the average household, and expensive vacations, clothing, education, lessons and activities.

CP at 759. The trial court made no other findings to support its award of child support above the standard calculation.

In calculating child support, the trial court declined to impute to Julia any income other than her pre-trial maintenance payments. The trial court ordered Victor to pay monthly child support of $5,000, as well as his proportional share (72 percent) of child care, education, and extracurricular expenses. In a motion for reconsideration, Victor asked the trial court to include in Julia's income any interest he owed to Julia on his deferred property payments. The trial court denied Victor's motion.

Victor appeals the trial court's maintenance, property payment, and child support orders.

ANALYSIS

A.    STANDARD OF REVIEW

Trial courts are entitled to broad discretion in dissolution proceedings. *In re Marriage of Wright*, 179 Wn. App. 257, 261, 319 P.3d 45 (2013). Because the trial court is in the best position to determine what is fair, its decisions will be reversed only if there has been a manifest abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). A trial court abuses its discretion if its decisions are based on untenable grounds or untenable reasons. *Id.* This discretion applies to determinations regarding division of property, maintenance, and child support. *Wright*, 179 Wn. App. at 261 (property division); *In re Marriage of Valente*, 179 Wn. App. 817, 822, 320 P.3d 115 (2014) (maintenance); *In re Marriage of Krieger*, 147 Wn. App. 952, 959, 199 P.3d 450 (2008) (child support).

We review findings of fact entered after a bench trial for substantial evidence. *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011). Substantial evidence exists when there is sufficient evidence to persuade a fair-minded, rational person of the finding's truth. *Id.* We treat unchallenged findings of fact as verities on appeal. *In re Marriage of Fiorito*, 112 Wn. App. 657, 665, 50 P.3d 298 (2002).

We do not substitute our judgment for the trial court's judgment, weigh the evidence, or evaluate witness credibility. *Wilson*, 165 Wn. App. at 340. When the trial court has weighed the evidence, we determine only whether substantial evidence supports the findings of fact, and if so, whether the findings support the trial court's conclusions of law. *Id.* We review the trial court's conclusions of law de novo. *In re Marriage of Wehr*, 165 Wn. App. 610, 613, 267 P.3d 1045 (2011).

B.     MAINTENANCE AS DOUBLE RECOVERY

Victor argues that Julia's maintenance award constitutes an improper double recovery because both maintenance and her property distribution of half of FFM's value were based on FFM's future income. We hold that the maintenance award does not result in double recovery.

1.     Legal Principles

RCW 26.09.090 addresses spousal maintenance. The trial court shall award maintenance "in such amounts and for such periods of time as the court deems just." RCW 26.09.090(1). When determining the appropriate maintenance amounts, trial courts must consider "all relevant factors including but not limited to" six enumerated factors. RCW 26.09.090(1).

Maintenance is a flexible tool for equalizing the parties' standards of living for an appropriate period of time. *Wright*, 179 Wn. App. at 269. The only limitation under RCW 26.09.090 is that the award be just. *Id.* The trial court has broad discretion in awarding maintenance. *In re Marriage of Kile*, 186 Wn. App. 864, 886, 347 P.3d 894 (2015).

Under RCW 26.09.090(1)(a), a trial court's maintenance order should consider the division of the community's property as one of many factors. However, when maintenance and property awards are paid from the same asset in a manner that unfairly burdens the payor spouse, the maintenance award duplicates the property division of that asset. *See In re Marriage of Barnett*, 63 Wn. App. 385, 388-89, 818 P.2d 1382 (1991).

2.     Double Recovery Cases

Victor relies on *Barnett* and *In re Marriage of Mathews*, 70 Wn. App. 116, 853 P.2d 462 (1993), which he claims support a finding that Julia's maintenance award duplicates her property award.

8

a.  *Barnett* and *Mathews*

Washington courts first addressed double recovery – also called "double dipping" – in *Barnett*. In that case, the community's major asset was a salvage business, which consisted of real property and scrap metal valued at $200,000. *Barnett*, 63 Wn. App. at 386. Mr. Barnett delivered scrap metal to buyers at an average price of $2,000 per delivery. *Id.* But Mr. Barnett did not plan to replace his inventory, so the salvage yard's value was decreasing with each sale. *Id.* at 388. Mr. Barnett apparently had no other source of income. After the Barnetts separated, the trial court (1) ordered Mr. Barnett to make reasonable efforts to sell the business and gave Mrs. Barnett a $100,000 lien against the business, and (2) required Mr. Barnett to pay monthly maintenance of $500. *Id.* at 386.

> Division Three of this court, without discussion or analysis, stated as follows:
>
> Our review of the record indicates the maintenance award was an attempt to distribute Mrs. Barnett's share of the business as realized through the future sale of salvage. That distribution had, however, already been effected by the $100,000 lien to Mrs. Barnett for one-half of the value of the salvage business. In effect, the same property was distributed twice. This was error.

*Id.* at 388. However, the court held that maintenance was proper until the business was sold and Mrs. Barnett received the $100,000 property award or until interest started accruing on the lien. *Id.* at 388-89.

In *Mathews*, a firefighter with monthly income of $2,800 and his wife, who was not employed, separated after a lengthy marriage. 70 Wn. App. at 118. The trial court awarded Mrs. Mathews indefinite monthly maintenance of $1,400 and a 50 percent interest in Mr. Mathews's $73,564 retirement account. *Id.* at 119-20.

9

Division Three rejected the trial court's maintenance award "because it [did] not evidence a fair consideration of the statutory factors," including that the payor "have the 'ability . . . to meet his needs and financial obligations.' " *Id.* at 123 (quoting RCW 26.09.090(1)(f)). Among other things, the court noted that the trial court's order did not provide for a reduction of maintenance after Mr. Mathews retired, when presumably he would have no income besides his retirement account. *Id.* at 124-25. This meant that Mr. Mathews would be forced to give up half of his retirement account and still pay maintenance out of the half left to him. *Id.* The court stated without analysis (and without mentioning "double dipping") that this was "clear error." *Id.* at 125.

*Barnett* and *Mathews* both involved two key facts. First, the property the trial court divided was a diminishing asset that did not generate any significant future income. Second, the only source of funds to pay maintenance was liquidation of the asset that had been divided between the parties.

In *Barnett*, the business's primary asset was an inventory of scrap metal, and Mr. Barnett essentially was liquidating that inventory rather than operating an ongoing business.[3] So any "income" Mr. Barnett received from scrap metal sales reduced the business's value. 63 Wn. App. at 388. In *Mathews*, Mr. Mathews's retirement account would reduce in value once he started receiving retirement benefits. 70 Wn. App. at 123-25. The unstated assumption in both cases was that after the parties' assets had been divided, Mr. Barnett and Mr. Mathews (after retirement) could not pay the maintenance awarded without eroding the portion of the asset left

---

[3] As Division One of this court stated about *Barnett*, "[t]he husband's proceeds from the business were not from its operation but from its liquidation." *Valente*, 179 Wn. App. at 829.

to them. Therefore, there was true double recovery – the wives received a portion of the community asset and then received maintenance paid from the husband's portion of the same asset.

The two key facts in *Barnett* and *Mathews* are not present in this case. FFM is not a fixed asset, but instead is a going concern that the trial court found would continue to grow. Both experts agreed FFM would generate annual income for Victor into the foreseeable future at a rate similar to the $927,000 he received in 2013. Their valuation was based on the understanding that Victor receives FFM's profits annually and will continue to do so in the future. Unlike in *Barnett* and *Mathews*, Victor's receipt of FFM's annual income will not diminish FFM's value. Victor does not need to erode FFM's value in order to pay maintenance.

b. *Valente*

Another case addressing the double recovery argument is *Valente*, a case more similar to the Chengs' situation. That case involved distribution of the community's business in addition to maintenance. *Valente*, 179 Wn. App. at 821. During the marriage, Mr. Valente started a successful business and Mrs. Valente was not employed while raising their children. *Id.* at 820. The trial court awarded Mrs. Valente over $3.2 million of the community's assets, which included a portion of the business's value, as well as monthly maintenance of $10,000 for seven years. *Id.* at 821. The business was valued based on its income stream, less Mr. Valente's reasonable replacement compensation of $400,000. *Id.* at 829-30.

Mr. Valente argued that because the business's valuation was based on its future income streams, Mrs. Valente was already compensated for her interest in those income streams when the trial court awarded her a portion of the company's value. *Id.* at 828-29. Therefore, he argued

11

that the award of maintenance based on his income, which came from the business, compensated Mrs. Valente twice for the same asset. *Id.* at 829. Division One of this court rejected this argument because Mr. Valente's reasonable replacement compensation was deducted from the company's income streams in determining the business's value. *Id.* at 829-30. Therefore, Mrs. Valente was not compensated for Mr. Valente's replacement income in the distribution of her portion of the company's value and there was no double recovery. *Id.*

Here, as in *Valente*, FFM's value was determined after deducting Victor's reasonable replacement compensation of $245,000. But Victor attempts to distinguish *Valente* on the grounds that in that case, the $400,000 replacement compensation was sufficient to support a $120,000 annual maintenance award. In this case by contrast, Julia's maintenance was $20,000 per month for the first eight months and $15,000 per month for the next two years, which could not be supported by Victor's $20,416 monthly replacement income. Therefore, Victor argues that the trial court necessarily considered more than his replacement compensation – that the maintenance award must have been based to a large extent on the income stream that was included in FFM's value.

However, we do not interpret *Valente* as requiring the trial court to consider only a business owner's replacement compensation in determining maintenance when the other spouse has been awarded a portion of the business's value. The court in *Valente* did not expressly adopt such a rule. Instead, the court seemed to focus on the fact that, regardless of the property distribution, Mr. Valente had at least $400,000 with which to pay the $120,000 annual maintenance. Similarly, in this case, regardless of the property distribution, Victor will have at

least $925,000 to pay Julia's maintenance *without having to erode FFM's value*. Therefore, the evidence shows that the trial court's maintenance award was just, as RCW 26.09.090(1) requires.

We hold that *Valente* does not support a finding that the trial court erred in awarding maintenance based on Victor's full income.

c. Summary

Because FFM generates net profit from its operations for Victor to receive as income without decreasing its value, this case does not involve double recovery for Julia. Victor will have close to $925,000 annually available to pay maintenance and despite this distribution of income FFM will retain its $3.6 million value. Therefore, we reject Victor's double recovery argument.

3. Amount of Maintenance Payments

Victor seems to suggest that even if his maintenance payments do not constitute double recovery, the amount awarded was excessive in amount and duration. But he does not explain how the trial court abused its discretion in making the award. He notes only that Julia was Harvard educated and could support herself, she will be receiving monthly $12,000 property distribution payments, and maintenance should only be based on Victor's $245,000 replacement compensation.

The trial court made detailed findings supporting its maintenance award. Victor does not argue that any of these findings are not supported by substantial evidence. Therefore, we reject Victor's argument that the maintenance award was excessive.

13

C.     INTEREST ON PROPERTY PAYMENTS

Victor argues that he should not be required to pay six percent interest on his deferred property payments. He claims that he should either pay no interest or three percent interest. We disagree.

Under RCW 4.56.110, judgments "shall" bear interest "at the maximum rate permitted under RCW 19.52.020." That maximum rate currently is 12 percent. RCW 19.52.020. In most cases, the trial court must comply with RCW 4.56.110 in determining the interest rate for a judgment. *See In re Marriage of Harrington*, 85 Wn. App. 613, 630-31, 935 P.2d 1357 (1997).

A limited exception to RCW 4.56.110 applies in dissolution cases. The trial court has discretion to impose a lower interest rate on deferred payments involving property distribution. *Berol v. Berol*, 37 Wn.2d 380, 383, 223 P.2d 1055 (1950); *In re Marriage of Davison*, 112 Wn. App. 251, 259, 48 P.3d 358 (2002). In doing so, the trial court must provide adequate reasons for imposing an interest rate lower than the statutory rate. *Davison*, 112 Wn. App. at 259. We review a trial court's interest rate determination on deferred property payments for abuse of discretion. *See id.*

In this case, the trial court allowed Victor to make deferred property payments because he could not pay Julia the equalizing amount immediately. The trial court found that "a 6% interest rate resolves the needs of both parties" without further explanation. CP at 729. Under *Davison*, Julia could have argued that the trial court did not make a sufficient finding to justify its deviation from the statutory interest rate of 12 percent.

14

Nevertheless, Victor argues that the trial court should have eliminated any interest or at least reduced the interest rate further. He suggests that FFM's projected growth is insufficient to justify six percent interest, and that three percent is more appropriate.

However, the trial court found that FFM's revenue would continue to grow, in addition to an already significant revenue stream. Without finding a specific growth rate for FFM, the trial court determined the projection made by Julia's expert – revenue growth of 10 percent in 2014 and 2015 before easing into annual three percent growth after 2017 – "overly optimistic, but slightly more credible" than Victor's projection for a 10 percent decrease in 2014 followed by annual three percent growth. CP at 727. This growth will increase Victor's already significant adjusted gross income. In 2013 he made over $927,000, and the trial court estimated he would receive a similar amount in 2014.

Victor cites *In re Marriage of Young*, where the court held that a trial court's reasoned decision not to impose interest on a deferred property payment relating to the community's business was not an abuse of discretion. 18 Wn. App. 462, 466, 569 P.2d 70 (1977). But the court did not hold that imposing no interest was *required* when dividing a business.

A trial court has discretion to impose an interest rate lower than 12 percent on deferred property payments, and the trial court exercised that discretion here to reduce the interest rate to six percent. Victor has not shown that the trial court abused its discretion in not reducing the interest rate even further. We affirm the trial court's judgment imposing six percent interest on the deferred property payments.

D.    CREDIT FOR POST-SEPARATION PAYMENTS

Victor argues that the trial court erred when it declined to give him credit in its property allocation for pension and tax payments he made after he and Julia separated, despite another judge's pretrial order allowing such a credit. We disagree on both claims.

1.    Pension Payment

Victor claims that the pension payment involved a community debt and that he should be credited for his payment because he paid the debt with post-separation earnings. This argument is inconsistent with the evidence presented at trial.

The evidence established that federal tax law required FFM to make the contested pension payment, not Victor and Julia individually. *See* CP at 326 (noting that the pension plan was governed by I.R.C. § 412); 26 U.S.C. § 412(a), (b) (requiring employers to make contributions to defined benefit plans). Further, FFM deducted from its 2013 tax liability the same amount that Victor claims was a personal expense. CP at 1329 (deducting $83,316 for "[p]ension, profit-sharing, etc, plans"). And because this was a 2013 debt, the trial court found that it was captured by FFM's valuation conducted by both parties' experts.

The trial court noted that another judge had indicated before trial that Victor would be entitled to a credit. But the trial court emphasized that the prior judge lacked the evidence presented at trial on this issue.

Victor claims the trial court's decision was nonetheless improper because "the husband and the company are one in the same" and the "payment was not included in the value of the company." Br. of Appellant at 34. Both claims are incorrect. Although all of FFM's earnings passed through to Victor, a corporation is an entity that is separate from its owners. *Landstar*

16

*Inway, Inc. v. Samrow*, 181 Wn. App. 109, 122-23, 325 P.3d 327 (2014). And the pension liability arose in 2013, during the period used by both experts to determine FFM's value.

By denying Victor credit for the pension payment, the trial court determined that it was more appropriate to attribute the payment to FFM. This decision was not an abuse of discretion, given that FFM itself assumed the benefit of that payment in its tax filings. We hold that the trial court did not err in denying this credit.

2. Tax Payment

Victor claims that he should receive credit for paying $94,923 in 2013 back income taxes. Victor argues that Julia never challenged the community's responsibility for all 2013 income taxes and points out that she signed the 2013 joint tax return.

But the trial court found on Victor's motion for reconsideration that Julia did not benefit equally from FFM's extremely profitable fourth quarter, which occurred after the Chengs separated. Victor points out that he was paying temporary maintenance and all family expenses, including a $400,000 remodel of their house. But Julia's maintenance was only $10,000 per month while Victor earned over $927,000 from FFM in 2013. The trial court's decision not to credit Victor for the tax payment was based on its conclusion that Victor was not sharing equally with Julia after their separation. *Cf. In re Marriage of Griswold*, 112 Wn. App. 333, 351-52, 48 P.3d 1018 (2002) (requiring one spouse to pay property taxes on the couple's house, including for the year during which they separated, when that spouse had possession of the home).

The trial court has broad discretion in dividing community property. *Wright*, 179 Wn. App. at 261. An equitable distribution does not require mathematical precision. *In re Marriage*

*of Larson*, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). We hold that the trial court did not abuse its discretion in denying this credit.

E.     INCOME AVAILABLE FOR CHILD SUPPORT CALCULATION

       1.    Interest as Income to Julia

Victor argues that the trial court erred by not including the six percent interest he will pay on the deferred property payments as income to Julia when making the child support calculation. We agree that the interest should have been included in Julia's income.

Under RCW 26.19.071(1), a trial court must consider "[a]ll income and resources of each parent's household" when calculating each parent's child support obligation. The statute further provides that "income" includes income "from any source," including "interest." RCW 26.19.071(3)(i). The statute does not contain any exception for interest earned from deferred property distribution payments. Therefore, the statute's plain language indicates that the interest Julia receives on Victor's property payments falls within the definition of income under RCW 26.19.071.

Julia emphasizes that income for child support purposes does not include a spouse's property payments. *In re Marriage of Stenshoel*, 72 Wn. App. 800, 805, 866 P.2d 635 (1993) (characterizing such payments as "represent[ing] property [the recipient] already owns"). Therefore, she argues that the interest on those payments also should not be income. But Julia cites no authority that supports this position.[4] In the absence of such authority, we cannot ignore the plain statutory language.

---

[4] The only case Julia cites is *In re Marriage of Ayyad*, but that case involves the exercise of stock options, not interest on property payments. 110 Wn. App. 462, 469, 38 P.3d 1033 (2002). In

We hold that the trial court erred in not treating Victor's interest payments as income to Julia for child support purposes.

2.    Imputation of Income to Julia

Victor argues that the trial court erred in not imputing any income to Julia, who he contends is "voluntarily unemployed" under RCW 26.19.071(6).  We disagree.

Under RCW 26.19.071(6), the trial court must "impute income to a parent when the parent is voluntarily unemployed or voluntarily underemployed . . . based upon that parent's work history, education, health, and age, or any other relevant factors."  The statute also contains limited, inapplicable exceptions for parents who are either "unemployable" or are unemployed or underemployed in an effort to comply with a court order.  RCW 26.19.071(6).

Whether a parent is "voluntarily" unemployed depends on her demonstrated ability to find work.  *See In re Marriage of Goodell*, 130 Wn. App. 381, 390, 122 P.3d 929 (2005).  A trial court should impute income to a gainfully employed parent who voluntarily leaves his or her job without some "reasonable explanation" for not remaining employed.  *See id.* (imputing income to a mother who left her job after being unable to locate daycare for her children).  Courts have treated childrearing as an insufficient explanation for leaving work.  *See In re Marriage of Pollard*, 99 Wn. App. 48, 53-54, 991 P.2d 1201 (2000) (imputing income to mother who left military service to raise her children).  We review a trial court's decision on imputed income for abuse of discretion.  *Goodell*, 130 Wn. App. at 388.

---

*Stenshoel*, the case most on point, the payee conceded that her interest was income.  72 Wn. App at 805 n.2.

Here, although Julia is highly educated, she had not been employed for over a decade when the parties separated. In that time, her skills and education fell behind a rapidly changing workforce, with the result that she is no longer a competitive candidate for jobs commensurate with her education. Julia's extended unemployment made it difficult for her to get a job interview, much less an offer, despite her considerable efforts. Her trial testimony – that she sent out over 50 resumes and made over 100 networking contacts – suggests that her unemployment is not voluntary.

The trial court entered findings of fact stating that Julia would need retraining over one or two years before being able to fully re-enter the workforce. In light of Julia's work history and current situation, we hold that the trial court was within its discretion to deny Victor's request to impute income to Julia.

### 3. Deduction of Victor's Interest Payments

Victor argues that the trial court erred in not deducting his interest payments to Julia from his income calculation as business expenses. We disagree.

RCW 26.19.071(5)(h) states that normal business expenses of self-employed persons must be deducted from that person's income for child support purposes. Victor argues that his interest payments are a "business expense" because they are necessary to maintain his source of income. For support, Victor cites one case holding that an attorney's capital contributions to his law firm were properly deducted from his income as "normal business expenses." *In re Marriage of Mull*, 61 Wn. App. 715, 722, 812 P.2d 125 (1991).

But Victor's interest payments are not normal business expenses because they are not incidental to his upkeep of FFM as a going concern. In *Mull*, the partner's capital contributions

were an essential element of his ability to remain employed. By contrast, Victor's property payments are intended to divide his and Julia's community property. They have nothing to do with his ability to run the business.

We hold that the trial court did not err in failing to treat Victor's interest payments as a business expense that can reduce his income for child support purposes.

### 4.    Deduction of Pension Payments

Victor argues that the trial court erred by declining to deduct the pension payment from his income for the purposes of calculating his child support obligation. We disagree.

RCW 26.19.071(5)(c) states that mandatory pension payments must be deducted from that person's income for child support purposes. However, as we discussed above when addressing Victor's claim for a credit for a 2013 pension payment, the pension payments Victor references were attributed to FFM. Federal law requires employers to make pension payments, 26 U.S.C. § 412, and in 2013 FFM deducted the expense that Victor claims should be deducted from his personal income for child support. Further, Victor testified that he used FFM's business accounts to fund the pension obligations. There is no evidence in the record that Victor personally made pension payments.

We hold that the trial court properly determined based on the evidence presented in this case that pension payments should not be deducted from Victor's income.

### F.    CHILD SUPPORT GREATER THAN THE STANDARD CALCULATION

Victor argues that the trial court erred in awarding monthly child support of $5,000, which is greater than the standard calculation, because the trial court failed to make the required written findings of fact to justify child support above the standard calculation. We agree.

1.  Legal Principles

Chapter 26.19 RCW establishes the scheme for determining a parent's child support obligation. Child support must be "equitably apportioned between the parents" in order "to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. In the typical case, the presumptive child support obligation is established by a schedule set out in RCW 26.19.020. That schedule lists support obligations by income level, excluding expenses like health care, child care, and tuition. RCW 26.19.080. However, when the parents' combined monthly income exceeds $12,000, a trial court may, in its discretion, exceed the presumptive support amount "upon written findings of fact." RCW 26.19.020.

The required findings of fact under RCW 26.19.020 must be more than cursory, and must show "that the trial court *properly exercised its discretion* in making the award." *In re Marriage of McCausland*, 159 Wn.2d 607, 620, 152 P.3d 1013 (2007). A trial court should consider at a minimum the "*Daubert/Rusch* factors": "(1) the parents' standard of living and (2) the children's special medical, educational, or financial needs." *Id.* at 618, 621; *see In re Marriage of Daubert*, 124 Wn. App. 483, 495-96, 99 P.3d 401 (2004); *In re Marriage of Rusch*, 124 Wn. App. 226, 233, 98 P.3d 1216 (2004).

Findings of fact that do not specifically address the required factors will not allow child support greater than the statutory schedule. In *McCausland*, the trial court's finding that the children had the expectation of child support at the level of their father's significant historical income was insufficient. 159 Wn.2d at 613. The trial court's findings in *Daubert* were similarly insufficient. The trial court in that case made three findings of fact:

22

> 1. The father has sufficient wealth and resources that the amount ordered will not work a hardship on him[.]
> 2. The children need the additional amount to have [a] standard of living commensurate with that of their father's.
> 3. The children will benefit by the opportunities available to them from the additional funds.

124 Wn. App. at 497 (alterations in original). The court concluded that these findings failed to establish the expenditures as "both necessary and reasonable." *Id.* In addition, the court noted that there was nothing in the trial record to support a claim of need above the standard amount. *Id.* at 497-98.

2. Trial Court's Findings of Fact

Here, the trial court's express finding of fact on imposing an above-standard calculation was relatively sparse. It cited the appropriate legal standard, but noted only that "[t]here are children in need of support and that support should exceed the maximum level . . . due to the lifestyle that has been enjoyed by the children." CP at 759. The trial court did not directly or indirectly address the *Daubert/Rusch* factors. Although the trial court referenced exhibits provided by the parents, it did not make any express findings of fact regarding the information contained in those exhibits.

We hold that the trial court's single finding of fact is insufficient to support a child support award above the standard calculation. Accordingly, we remand to the trial court to reconsider the child support calculation and to enter sufficient findings if it again concludes that a child support award above the standard calculation is appropriate.[5]

---

[5] Victor also claims that the trial court's $5,000 monthly award is excessive because it exceeds what Julia testified were the children's total expenses. Because we are remanding for reconsideration of the child support calculation, we do not address this argument.

CONCLUSION

We affirm the trial court's maintenance and property distribution orders, but we reverse for the trial court's refusal to include interest Julia will receive from Victor in the calculation of Julia's income for child support purposes and the award of child support above the standard calculation. We remand to the trial court for reconsideration of the appropriate child support award after including interest in Julia's income and considering whether the evidence is sufficient to award child support above the standard calculation.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, A.C.J.


We concur:

_____
JOHANSON, J.

_____
LEE, J.