48 P.3d 1018 (2002)
112 Wash.App. 333
In re the MARRIAGE OF Helen J. GRISWOLD, Appellant, and
Michael T. Griswold, Respondent and Cross-Appellant.
No. 19896-1-III.
Court of Appeals of Washington, Division 3, Panel Seven.
June 27, 2002.
Reconsideration Denied July 26, 2002.
*1020 Martin L. Salina, Salina, Sanger & Gauper, Spokane, for Appellant.
Mary E. Schultz, Amy L. Robinson, Spokane, for Respondent.
*1019 KATO, A.C.J.
Both parties to this marital dissolution action are appealing the superior court's distribution of property. The primary issues involve the court's characterization of an employment bonus and lawsuit settlement proceeds that the husband received after the parties separated. The husband also contends the property distribution was inequitable. The wife raises eight other miscellaneous issues involving the court's distribution. We affirm.
Helen J. Griswold and Michael T. Griswold were married in 1983. Mr. Griswold earned a bachelor's degree in accounting and a master's degree in business administration after the parties married. Ms. Griswold worked throughout the marriage. By the 1990s, she was operating a small business, from which she earned about $12,000 per year.
Mr. Griswold began working for Washington Water Power Company as a financial analyst in 1989. In the years 1992 to 1996, Mr. Griswold's wages, including bonuses, ranged from about $42,000 to about $62,000. In 1997, he began working as an energy trader with Avista Energy, with an annual salary of $75,000. He became the senior power trader in 1998, and his earnings increased *1021 to $219,000, consisting of $120,000 in salary and the rest in bonuses.
The parties separated on November 2, 1998. Ms. Griswold filed this action, and the court conducted a trial in October and December 2000. The court entered a decree of dissolution and other related documents in January 2001. In its initial findings of fact and conclusions of law, the court awarded each party all of his or her separate property and half of the community property. On reconsideration, the court awarded to Ms. Griswold $138,000 of Mr. Griswold's separate property. Both parties appeal the court's distribution of the marital property.
We first consider the trial court's characterization of an employment bonus Mr. Griswold received in 1999. Pursuant to an incentive plan that Avista Energy implemented in 1998, Mr. Griswold received a bonus of $980,772 in March 1999, just a few months after the parties separated. This amount was comprised of several elements: (1) $32,358 was based on the company's total performance during 1998; (2) $35,035 was called "holdback and discretionary," which was a reserved amount to be paid out at year's end based on nonquantitative employee criteria; (3) $5,372 was called a "Q4 bonus," which was an amount awarded to traders involved in long-term contracts; (4) $848,006 was called the "super trader award" or "special trader award," which was based on the value of an individual trader's "book";[1] (5) $60,000 was to mitigate Mr. Griswold's concerns about being shorted by the bonus plan and to give him an incentive to remain at Avista Energy. To be eligible for a bonus under Avista Energy's plan, a trader was required to remain employed at the time the bonus is paid.
Mr. Griswold's bonus thus was based primarily on the value of his book. Because electricity prices fluctuated dramatically,[2] the resulting value of his book also fluctuated dramatically. Mr. Griswold testified that the base figure for the "super trader award" increased by $620,000 from November 2, 1998, when the Griswolds separated, to the end of the 1998 calendar year, when the bonus amounts were calculated. He testified that he completed 1,200 to 1,500 trades during that two-month period. One of those was the so-called "Enron sale" of electricity that he had purchased in October 1998, yielding a profit of $4.2 million.
In characterizing the Griswolds' property, the trial court held that the bonus would be calculated on a pro rata basis from January 1, 1998, through November 2, 1998 (the date of separation). The court thus concluded that 84 percent of the bonus was community property and 16 percent was Mr. Griswold's separate property. The court awarded to Mr. Griswold all of his separate portion of the bonus and half of his community portion.
Both parties are appealing the court's characterization of the bonus.
In a dissolution action, the court must make a "just and equitable" distribution of the marital property. RCW 26.09.080. A trial court has broad discretion in distributing the marital property, and its decision will be reversed only if there is a manifest abuse of discretion. In re Marriage of Kraft, 119 Wash.2d 438, 450, 832 P.2d 871 (1992). All of the parties' property, both community and separate, is before the court for distribution. In re Marriage of Olivares, 69 Wash.App. 324, 328, 848 P.2d 1281, review denied, 122 Wash.2d 1009, 863 P.2d 72 (1993). Factors to be considered are: (1) the nature and extent of the community property; (2) the nature and extent of the separate property; (3) the duration of the marriage; and (4) the economic circumstances of the parties. RCW 26.09.080. In applying these factors, the court first must characterize the marital property as either separate or community. Olivares, 69 Wash.App. at 329, 848 P.2d 1281.
A court's characterization of property as either separate or community is a question of law subject to de novo review. In re Marriage of Skarbek, 100 Wash.App. *1022 444, 447, 997 P.2d 447 (2000). However, factual findings upon which the court's characterization is based may be reversed only if they are not supported by substantial evidence. Id. "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. SHARE, 106 Wash.2d 212, 220, 721 P.2d 918 (1986), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).
Assets acquired during a marriage are presumed to be community property. In re Marriage of Short, 125 Wash.2d 865, 870, 890 P.2d 12 (1995). This presumption may be rebutted by showing the assets were acquired as separate property. Id. Spouses' earnings and accumulations during a permanent separation are considered separate property. Id. at 871, 890 P.2d 12; RCW 26.16.140.
In Short, our Supreme Court addressed the question whether employee stock options, which were unvested during the spouses' marriage but became vested during their separation, should be characterized as separate or community. The court applied the so-called "time rule":
To determine how unvested employee stock options are characterized under RCW 26.16, a trial court must first ascertain whether the stock options were granted to compensate the employee for past, present, or future employment services. This involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options. Unvested employee stock options granted during marriage for present employment services, assuming the parties were not "living separate and apart" under RCW 26.16.140 when the stock options were granted, are acquired when granted. Unvested employee stock options granted for future employment services are acquired over time as the stock options vest. See In re Estate of Binge, 5 Wash.2d 446, 484, 105 P.2d 689 (1940).
Short, 125 Wash.2d at 873, 890 P.2d 12.[3]
Mr. Griswold contends the bonus is his separate property because he received it after the separation. He presents essentially two arguments for why the time rule should not apply here. First, he contends his book had no inherent value because of the market volatility and the need for discretionary decisions by the trader. But the fluctuating value of property and the continued need for discretionary decisions do not render the property valueless. As even Mr. Griswold recognizes, the book had a specific, though fluctuating, value on specific dates.
Second, Mr. Griswold contends the bonus had no value when the parties separated (or even, presumably, at the end of the calendar year) because his receipt depended on satisfaction of the requirement that he remain employed at the time the bonus was paid. But the unvested stock options in Short, to which the court applied the "time rule," also were contingent on continued employment. Short, 125 Wash.2d at 871, 890 P.2d 12; see also In re Marriage of Stachofsky, 90 Wash. App. 135, 145, 951 P.2d 346, review denied, 136 Wash.2d 1010, 966 P.2d 904 (1998). This requirement alone does not preclude application of the "time rule."
The "time rule" requires a trial court to determine, as a matter of fact, whether the benefit is conferred for past, present, or future services. Short, 125 Wash.2d at 873, 890 P.2d 12. Here, the court impliedly found Mr. Griswold's bonus was compensation for his services during 1998, and this finding is supported by substantial evidence.[4]
*1023 Mr. Griswold likens the bonus to severance pay, which "carries with it no contractual right to a payment that arises after a certain number of years of employment and which will definitely be paid in the future." In re Marriage of Bishop, 46 Wash.App. 198, 201, 729 P.2d 647 (1986). In Bishop, the court held that severance pay received after the marriage was the separate property of the receiving spouse, recognizing that "[i]t is something of value over and above the community's contribution, and cannot truly be considered as having been onerously traded by the community." Id. at 203, 729 P.2d 647. Here, by contrast, the trial court impliedly found that Mr. Griswold's bonus was compensation for his services in 1998. His services thus were "onerously traded" by the community during the period when the community existed. Bishop's reasoning does not apply.
Mr. Griswold's arguments have no merit.
Ms. Griswold, too, objects to the court's application of the "time rule." Contending the value of Mr. Griswold's book changed daily based on market factors alone, she argues the evidence was insufficient to show that his efforts after separation on November 2, 1998, contributed to the amount of the 1998 bonus. See In re Marriage of Sedlock, 69 Wash.App. 484, 508, 849 P.2d 1243, review denied, 122 Wash.2d 1014, 863 P.2d 73 (1993) (increase in value attributable to market forces does not change character of property). She argues that Mr. Griswold had the ability to prove the value of the postseparation trades, but he failed to do so. This argument fails to recognize the complexity of the business in which Mr. Griswold was engaged. For example, the "Enron trade" involved a purchase before separation and a sale after separation. RP at 512. Assigning the value of the entire transaction to pre- or postseparation efforts would both complicate the analysis and ignore the circumstances. Based on Mr. Griswold's testimony that he engaged in 1,200 to 1,500 trades from November 2, 1998 through the end of the calendar year, the trial court properly found the bonus was a result of Mr. Griswold's efforts both before and after separation.
The court did not err in characterizing Mr. Griswold's bonus as partly community and partly separate property.
We next consider the court's characterization of settlement proceeds from a lawsuit Mr. Griswold filed against Avista Energy. Shortly after receiving his bonus in March 1999, Mr. Griswold left Avista Energy and began working with another company. He then hired a lawyer, Robert Dunn, to pursue a claim against Avista Energy for breach of contract, wrongful discharge, and constructive termination. In a demand letter dated March 16, 2000, Mr. Dunn alleged that "as a quick fix to [Avista Energy's] budget shortcomings, the Incentive Plan was ultimately capped despite representations to employees that bonus payments would be `uncapped.'" Exhibit (Ex.) R-156, p. 4. The letter detailed Mr. Griswold's claims of underpayment for the years 1997 and 1998, and added that he also was owed an undetermined but "substantial sum" as compensation for trades he executed in 1999. The letter offered to settle Mr. Griswold's claim for $1,483,304, an amount that Mr. Dunn said did not include compensation for 1999 trades, penalties, or interest.[5]
In September 2000, Mr. Dunn took the deposition of Thomas Johns, Mr. Griswold's supervisor at Avista Energy. As a result of Mr. Johns' testimony, Mr. Dunn testified that "I was firmly convinced that we had established without a doubt the fact that the `99 book for Mr. Griswold was substantiated." RP at 757. Mr. Dunn immediately withdrew the prior settlement offer, which he believed did not reflect "the full scope and *1024 extent of the '99 claim." RP at 759. He testified the potential value of the 1999 claim "was a very, very large number." RP at 759. In an e-mail message to Mr. Dunn, Mr. Griswold valued his claim for 1999 at $4,528,297. Mr. Griswold acknowledged that this amount was based on "mid-market" prices and assumed the 1998 bonus plan would apply to his 1999 book.
Shortly after Mr. John's deposition, Avista Energy began negotiating to settle Mr. Griswold's claims. Mr. Dunn testified: "My opinion is that [Avista Energy] recognized they had some huge potential exposure in this case, and it was highlighted by the testimony of Mr. Johns and our moves to make the '99 claim the focus of our case." RP at 761-62.
Avista Energy settled with Mr. Griswold for $700,000. Despite Mr. Griswold's requests, Avista Energy refused to allocate any portion of the settlement amount to any particular year. Mr. Dunn testified that the case would not have settled for that amount without the claims for 1999, but he was unable to allocate specific portions of the settlement amount to a specific year.
In characterizing the settlement proceeds, the trial court first deducted attorney fees and other costs, leaving a remainder of $407,954.18. The court further found:
a) The community portion of these funds shall be calculated as follows: The amount of $1,483,304, reflecting the proportionate aspect of the bonus attributable to the 1997 and 1998 book of the husband[,] should be divided into the total value of the claim made for the years 1997, 1998 and 1999, or $6,011,601 ($1,483,304 plus $4,528,297 for the 1999 book value), to realize the starting point for the preliminary figure for the community component of this settlement. The figure of $4,528,297 for the 1999 book value does not include the Enron trade, as is indicated by Exhibit 138, but the Enron trade should have been included in the 1997/1998 book in any event, because it took place prior to 1999.
b) $1,483,304 divided into the sum total equals 25% of the whole. As applied to the remaining figure referenced above of $407,954.18, the starting point for determination of the distribution of the community share is $101,988.54.
c) From this starting point, and in order to realize the true community component, the resultant figure of $101,988.54 should then be pro rata determined based upon the number of days reflecting the existence of the community in 1998, i.e. from January 1, 1998 through November 2, 1998, or 84% as calculated above, for a total of $85,670.37.
Clerk's Papers (CP) at 10.
The court then divided this community component in half, reflecting a preliminary award to Ms. Griswold of $42,835.18. After deducting income taxes, the court awarded $25,872.45 to Ms. Griswold.
Mr. Griswold asks us to apply the rule that property is characterized by its status at the time of its acquisition. See In re Marriage of Zahm, 138 Wash.2d 213, 223, 978 P.2d 498 (1999). However, this presumption may be rebutted by evidence to the contrary. Id. Here, by asking Avista Energy to apportion the settlement proceeds, Mr. Griswold conceded some of the proceeds were properly attributed to his services before 1999. This evidence alone rebuts the presumption that the lawsuit proceeds were entirely Mr. Griswold's separate property.
Ms. Griswold contends, on the other hand, that the trial court erred by using Mr. Dunn's demand letter and Mr. Griswold's calculation of the value of his 1999 book as a basis for apportioning the proceeds. However, Mr. Griswold's and his lawyer's assessment of the values of the pre-1999 claims and the 1999 claims provides a basis for a fair-minded person to determine the relative values of those claims. Substantial evidence thus supports the court's determination that 25 percent of the proceeds was attributable to the pre-1999 claims and 75 percent was attributable to the 1999 claims.
Ms. Griswold raises three other issues regarding the lawsuit proceeds. First, she contends Mr. Griswold's claim for $1,483,304 acknowledged his prior receipt of the *1025 $980,077 bonus (which the court concluded was attributed to Mr. Griswold's pre-1999 services). She contends this amount should be added to Mr. Griswold's pre-1999 claims to establish the proper ratio. But the bonus was apportioned in a separate calculation. Ms. Griswold's attempt to include the bonus in allocating the lawsuit proceeds fails to recognize that 84 percent of the bonus was characterized as community property. The court did not err in excluding the bonus in allocating the lawsuit proceeds.
Second, Ms. Griswold contends the court erred in failing to consider the Enron trade. In his e-mail to Mr. Dunn, Mr. Griswold calculated the value of his 1999 book both with and without the Enron trade. Because this trade was completed before 1999, Ms. Griswold reasons, the trial court should have included it in the pre-1999 portion of the ratio. However, Mr. Dunn's initial demand letter expressly referred to the Enron trade, and its value thus was included in the offer to settle the lawsuit for $1,483,304. The court did not err in failing to add the value of the Enron trade to the pre-1999 portion of the ratio.
Third, Ms. Griswold points out that the trial court divided the pre-1999 portion of the lawsuit proceeds using the same 84 percent/16 percent formula it had used to divide the 1998 bonus into community and separate property portions. However, the pre-1999 portion of the lawsuit proceeds included claims for both 1997 and 1998. The court's formula thus failed to account for 1997. Arguably, this failure may be justified by Mr. Griswold's proposed settlement agreement, in which he attempted to allocate one-third of the proceeds to 1998 and two-thirds to 1999. But the trial court's calculation (quoted above) clearly recognized that the pre-1999 claims were for both 1997 and 1998. The court's formula thus is not based on substantial evidence and resulted in a mischaracterization of the property.
Failure to properly characterize the property may be reversible error. [Blood v. Blood, 69 Wash.2d 680, 682, 419 P.2d 1006 (1966)]. However, mischaracterization of property is not grounds for setting aside a trial court's allocation of liabilities and assets, so long as the distribution is fair and equitable. In re Marriage of Brady, 50 Wash.App. 728, 731, 750 P.2d 654 (1988); [Worthington v. Worthington, 73 Wash.2d 759, 768-69, 440 P.2d 478 (1968)]; Brossman v. Brossman, 32 Wash.App. 851, 854, 650 P.2d 246 (1982), review denied, 98 Wash.2d 1017 (1983). Where there is mischaracterization, the trial court will be affirmed unless the reasoning of the court indicates (1) that the property division was significantly influenced by characterization and (2) that it is not clear that the court would have divided the property in the same way in the absence of the mischaracterization. In re Marriage of Shannon, 55 Wash.App. 137, 142, 777 P.2d 8 (1989).
In re Marriage of Olivares, 69 Wash.App. 324, 330, 848 P.2d 1281, review denied, 122 Wash.2d 1009, 863 P.2d 72 (1993).
Here, the trial court awarded exactly half of the community property to each party. Arguably, then, the court's initial property division was influenced by the mischaracterization. However, on reconsideration, the court revised its property distribution and awarded Ms. Griswold $138,000 of Mr. Griswold's separate property. This decision makes it clear the characterization did not significantly influence the ultimate property distribution. Because we conclude below that the distribution as a whole was fair and equitable, the error does not require reversal.
Next, we address Mr. Griswold's contention that the court abused its discretion by awarding $138,000 of his separate property to Ms. Griswold. He points out that the court failed to find there were unusual or exceptional circumstances.[6] The origin of a requirement for exceptional circumstances appears to be Bodine v. Bodine, 34 Wash.2d 33, 35, 207 P.2d 1213 (1949), in which the court held:
While under Rem.Rev.Stat., § 989, all the property of the parties, community and *1026 separate, is before the superior court and subject to distribution, and while the superior court may, under certain circumstances, award part or all of one spouse's separate property to the other, the situations which warrant such action are exceptional.
Since that time, other cases have cited Bodine or its progeny for the requirement that exceptional circumstances are required to award one party the separate property of the other. See Browning v. Browning, 46 Wash.2d 538, 542, 283 P.2d 125 (1955); Merkel v. Merkel, 39 Wash.2d 102, 115, 234 P.2d 857 (1951); Olivares, 69 Wash.App. at 330, 848 P.2d 1281; Moore v. Moore, 9 Wash. App. 951, 953, 515 P.2d 1309 (1973). However, none of these cases acknowledges that in the same year the court decided Bodine, the Legislature revised the dissolution statute, listing the specific factors to be considered. See Laws of 1949, ch. 215, § 11. The revision modified the principle that one factor should weigh more heavily than others:
While both separate and community property have always been considered to be before the court in a dissolution action, it was not until the statute was revised in 1949 that the allocation of separate property was explicitly governed by statutory criteria. Laws of 1949, ch. 215, § 11, p. 701. Prior to this change the courts were free to weigh the character of the property more heavily than other factors when allocating separate property.
However, the current statute specifically applies the statutory criteria to separate property....
. . . .
... This court will not single out a particular factor, such as the character of the property, and require as a matter of law that it be given greater weight than other relevant factors. The statute directs the trial court to weigh all of the factors, within the context of the particular circumstances of the parties, to come to a fair, just and equitable division of property. The character of the property is a relevant factor which must be considered, but is not controlling.
In re Marriage of Konzen, 103 Wash.2d 470, 477-78, 693 P.2d 97, cert. denied, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985).
Under Konzen, a court need not find exceptional circumstances to justify awarding a portion of one spouse's separate party to the other spouse. The trial court here thus did not abuse its discretion by failing to find there were exceptional circumstances.
Finally, we briefly address several miscellaneous issues Ms. Griswold raises. The first is her contention that the court abused its discretion by failing to treat her pretrial draw from the Avista Energy bonus as support and maintenance and Mr. Griswold's pretrial draw as a property distribution. By agreement before trial, each party received $50,000 in cash from the Avista Energy bonus that Mr. Griswold received in March 1999. Ms. Griswold apparently used the money to supplement her net income from her business, which the court found was $1,000 per month. Mr. Griswold used the money to pay for living expenses, moving expenses, a new residence, and attorney fees. His gross income at the time was $12,500 per month.
In distributing the bonus, the trial court merely addressed the assets remaining in the account where Mr. Griswold deposited it. It therefore did not address the $100,000 that the parties already had received and spent. Because those assets no longer existed at the time of trial, the court had no duty to distribute them. See In re Marriage of White, 105 Wash.App. 545, 549, 20 P.3d 481 (2001).
Although Ms. Griswold asked the court to treat her portion of the draw as support and maintenance and Mr. Griswold's portion as a property distribution, the court clearly viewed the matter as having been resolved before trial with an equal distribution. Ms. Griswold has failed to demonstrate an abuse of discretion.
Next, Ms. Griswold contends the court erred in assigning to her the value of a ring that she sold before trial.[7] Among the *1027 personal property distributed by the court was a wedding ring valued at $3,500, which the court found was community property. Ms. Griswold testified she sold the ring for $3,000 in January 1999 because "I had no money for the kids and I."[8] RP at 153.
Although Ms. Griswold apparently contends the proceeds from the wedding ring should have been treated as a support or maintenance payment, the court instead chose to characterize it as community property and award it to her. Based on the evidence that Ms. Griswold had other assets at her disposal, there is no basis for concluding the court abused its discretion.
Next, Ms. Griswold contends the court abused its discretion by deducting money from the lawsuit settlement proceeds for Mr. Griswold's future attorney fees without requiring an accounting. Before distributing the lawsuit settlement assets, the court deducted $50,000 to pay for Mr. Griswold's expenses for legal representation in an investigation of Avista Energy's trading practices by the Commodity Futures Trading Commission. This was the amount set aside in the settlement with Avista Energy for attorney fees resulting from the investigation, which raised the possibility of civil or criminal liability for Mr. Griswold. The trial court's distribution did not address the possibility that Mr. Griswold's attorney fees might not reach $50,000, nor did it require a future accounting of the fees paid.
Based on the settlement's allocation of $50,000 to pay for future attorney fees, the court's decision to deduct this amount from the settlement proceeds before distribution was based on substantial evidence and was not an abuse of discretion.
In fact, when Ms. Griswold raised this issue again on reconsideration, Mr. Griswold presented an affidavit of his attorney stating his fees and costs already were approaching $50,000 and "would likely exceed $250,000." CP at 412. Ms. Griswold has cited no authority for her request for an accounting. As for her request for reimbursement of any overpayment, the record clearly suggests there has been no overpayment.
The court did not abuse its discretion in denying Ms. Griswold's request for reimbursement and an accounting.
Next, Ms. Griswold contends the court erred in failing to require redistribution of the bonus and settlement proceeds if Mr. Griswold amended his income tax returns or received a tax refund. In distributing both the bonus and the settlement proceeds, the court first deducted income taxes for each of the three years involved, based on the Internal Revenue Service's calculation provided to Mr. Griswold. From Ms. Griswold's portion of the lawsuit settlement proceeds, the court deducted Mr. Griswold's "incremental tax rate" of 39.6 percent. CP at 10. The court did not require an accounting or revision based on possible future amendment of these amounts.
Ms. Griswold has provided no evidence suggesting the trial court's tax calculations were incorrect or likely to be amended. Her argument is speculative, and she has provided no authority to support her request for an accounting. The court did not abuse its discretion by failing to order one.
Next, Ms. Griswold contends the court's valuation of the family home was not supported by substantial evidence. The court awarded to Ms. Griswold the equity in the family home, which it determined was worth $176,000. This was the amount of an appraisal dated September 2, 1997, which was introduced by Mr. Griswold. Ms. Griswold presented an appraisal, dated October 2, 2000, valuing the home at $149,000.
In explaining why it chose to accept the 1997 appraisal, the court noted in its oral decision:
The Court finds that the value of that home is $176,000. I looked at both Exhibits 70 and 95. Exhibit 70 by Mr. Davis which was done provided a value as of 10/2/2000. It seems to this Court that we *1028 have tried to put everything else as of the date of the separation. That value is probably not a correct value based upon that.
Granted that the value of Exhibit 95(the 1997 appraisal) is valuing the house as of September 22nd, 1997. But it appears to be more close in time and a more accurate representation of what the value is.
RP at 930-31.
Ms. Griswold points out that, contrary to the court's oral decision, it did not always value assets at the time of the parties' separation. She contends that the court should have concluded the house depreciated in value from 1997 to 2000 solely because of market forces, for which the community should be responsible. However, the 2000 appraiser noted that "[t]he overall condition of the home shows lack of maintenance and upkeep." Ex. P-70, p. 2. This evidence supports the court's decision to accept the 1997 appraisal, making her alone responsible for the lack of maintenance and resulting depreciation in the home's value. The trial court's finding is supported by substantial evidence.
Next, Ms. Griswold contends the court abused its discretion by assigning to her the 1998 real estate tax liability for the family home. In distributing the parties' debt, the court determined that $8,687 in real estate taxes on the family home were Ms. Griswold's separate debt. The court denied her motion for reconsideration.
Ms. Griswold apparently contends the $8,687 includes all or a portion of taxes for the year 1998. Because the parties separated only at the end of that year, she reasons, the community should be responsible for most of the 1998 taxes. However, she has cited to no evidence in the record to support her contention that the amount includes taxes for 1998.
In fact, although Ms. Griswold testified the 1998 real estate taxes had not been paid, she admitted she had not paid any real estate taxes on the home since the parties separated, even though she had lived in the home since that time and had received a $50,000 draw from Mr. Griswold's bonus to pay for various living expenses, including real estate taxes. Under the circumstances, the court did not abuse its discretion in assigning the entire debt to Ms. Griswold.
Next, Ms. Griswold contends the court abused its discretion by failing to assign to Mr. Griswold a loss from investing the Avista Energy bonus. When Mr. Griswold first received his bonus from Avista Energy, he deposited it into a Charles Schwab account and invested it in a municipal bond fund. The investment lost approximately $16,000 before Mr. Griswold transferred the investment to a money market account. The trial court found:
There should be no assessment against Mr. Griswold for any alleged loss in the Charles Schwab account under temporary orders. There is no evidence of an intentional misappropriation of those funds. The community has benefited greatly by the husband's otherwise appropriate investment ability and there is no basis to penalize either party for a loss which occurred.
CP at 335.
Ms. Griswold contends Mr. Griswold alone should bear the $16,000 loss, because it was his investment decision alone that caused it. She cites no authority in support of this contention.[9] In fact, as the trial court recognized, Mr. Griswold's financial decisions had profited the community greatly, and there was no reason why he alone should be held responsible for a particular loss. The court did not abuse its discretion in failing to assign this loss separately to Mr. Griswold.
Next, Ms. Griswold contends the court abused its discretion by declining to assign to Mr. Griswold the money he withdrew from a bank account containing community funds. During their marriage, the Griswolds maintained a checking account with Seafirst Bank.[10] Shortly after they separated, the account *1029 contained $14,382.70. Within two months, the account balance dwindled to $304.44. The court found in its oral decision:
The cash with regard to the amount in an account of the parties at the time of separation having a value of $18,607 alleged by Mrs. Griswold, the Court finds no basis to sustain that contention. The account was utilized by both parties, was utilized for the benefit of both parties.
RP at 934-35.
Ms. Griswold contends that, with three exceptions totaling $1,794.90, the money in the account was used exclusively to pay Mr. Griswold's expenses after the separation. But the trial court expressly found that both parties had utilized the account to pay their expenses. This finding is supported by Mr. Griswold's testimony that some of the money went to Ms. Griswold's business and "there are some bills paid out of this, too." RP at 856. The court did not abuse its discretion by declining to award the contents of the account to either party.
Finally, Ms. Griswold has requested an award of reasonable attorney fees on appeal. RCW 26.09.140 authorizes an appellate court, in its discretion and "after considering the financial resources of both parties," to award reasonable attorney fees. We agree with the trial court that, in light of the substantial assets available to both parties, an award of attorney fees in this case is unwarranted.
Affirmed.
WE CONCUR: SCHULTHEIS and KURTZ, JJ.
NOTES
[1] A trader's "book" is the sum of his or her contracts to sell or buy electricity as a commodity.
[2] For example, when trial started on October 11, 2000, electricity traded at $75 per megawatt hour. By December 6, 2000, electricity was selling for $1,400 per megawatt hour. Report of Proceedings (RP) at 900.
[3] Mr. Griswold cites In re Marriage of Hurd, 69 Wash.App. 38, 848 P.2d 185, review denied, 122 Wash.2d 1020, 863 P.2d 1353 (1993), for the proposition that an unvested right is not subject to characterization as community property. However, Hurd merely held that a vested and matured pension right must be valued at the time of the dissolution, rather than some future date. Id. at 46, 848 P.2d 185. This holding does not mean, as Mr. Griswold contends, that unvested rights cannot be considered community property. Even if it did, the Supreme Court made it clear in Short that unvested rights may be characterized as community property.
[4] Mr. Griswold also contends the $35,035 "holdback and discretionary" portion of the bonus and the $60,000 mitigation and incentive payment were not payments for services during 1998. However, the holdback portion was based on amounts reserved from earnings during 1998 and thus was payment for specific employee qualities during that year. And while the $60,000 payment was partly an incentive for him to remain employed at Avista Energy, the same could be said ofany bonus. Substantial evidence supports the trial court's finding that the entire bonus was compensation for Mr. Griswold's services during 1998.
[5] Another demand letter, dated August 22, 2000, alleged Avista Energy violated Washington wage statutes, but it also did not quantify Mr. Griswold's 1999 underpayment claim.
[6] Ms. Griswold has assigned error to the court's "Award to the Husband of all of his `Separate Property.'" Brief of Appellant at 13. However, she concedes this issue has been resolved by the court's additional award on reconsideration. See Reply Brief of Appellant at 5.
[7] Ms. Griswold also argues in her brief that the court also erred in failing to assign to Mr. Griswold another ring valued at $3,500. She has not assigned error to this failure, nor has she demonstrated that she ever asked the trial court to take such action. She thus has waived the issue on appeal. See RAP 2.5(a); RAP 10.3(a)(3).
[8] Ms. Griswold also testified she and the children had vacationed in Mexico over the New Year's holiday.
[9] Ms. Griswold also fails to cite to the record in support of her contention that Mr. Griswold had been ordered "to deposit those funds [in]to a safe haven, market rate account." Brief of Appellant at 39.
[10] The parties apparently agree the account contained community funds.