**FILED**
**AUGUST 18, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STEPHEN THOMAS KIRBY, | ) | |
| | ) | No. 37891-8-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JODI LYNN MCMAHON, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Stephen Kirby challenges the superior court's limited modification of a parenting plan covering his two children. He seeks a major modification granting him equal residential time. Because the superior court reviewed all relevant factors and because substantial evidence supports the superior court's ruling favoring the mother, Jodi McMahon, we affirm.

FACTS

A superior court must engage in a fact intensive analysis in response to a parent's motion to modify a parenting plan. We garner those facts for this appeal from trial testimony and evidence gathered by the children's guardian ad litem.

Stephen Kirby and Jodi McMahon married in 2008. Kirby and McMahon beget one son, Robert, born in January 2010, and one daughter, Rebecca, born in September 2011. We employ pseudonyms for the children. In 2013, Kirby filed for divorce.

On February 5, 2014, the trial court signed an agreed final parenting plan. Petitioner Steven Kirby failed to forward to this court the 2014 parenting plan. We gather some of the terms of the plan from the superior court's ruling in response to Kirby's petition to modify the plan.

At the time the parenting plan was entered, Robert and Rebecca were respectively four and two years old. The parenting plan read that the children, when under school age, would reside with Stephen Kirby every other Friday from 5:30 p.m. until Sunday at 7:00 p.m. At other times, the children would reside primarily with Jodi McMahon. When Robert entered school, both children would reside with Kirby every other week during summer break. In the final paragraph of the plan, Kirby and McMahon agreed to annually review, for potential plan modifications, "'the children's changing needs and ability to tolerate an expanded visitation schedule with their father.'" Clerk's Papers (CP) at 367-68. Until November 2017, the parenting plan remained the same.

2

Since February 2014, Steven Kirby has failed to exercise any of his equal summer schedule. Kirby did not exercise many of his opportunities to have the children during spring breaks or Thanksgiving time because he does not enjoy holidays.

Both Jodi McMahon and Stephen Kirby are self-employed. McMahon holds a Master's Degree in acupuncture and oriental medicine. She works as an acupuncturist. McMahon usually works from 9:00 a.m. to 5:00 p.m. on weekdays. Kirby owns a small information technology firm. Kirby's schedule permits flexible hours, and he sometimes works late nights. Both parents sometimes utilize the service of nannies to watch the children when working.

Son Robert undergoes therapy with counselor Brenda Aufderhar. Stephen Kirby does not support the therapy. Aufderhar believes Robert's cousin inappropriately touched Robert, when Robert was age five. Robert told Aufderhar that his mother failed to protect him from the abuse. When Aufderhar requested clarification, Robert responded that his father told him that his mother had failed to protect him and that his father always tells the truth.

When residing with Stephen Kirby, the two children sleep in the same bed with him. According to Kirby, attachment theory promotes this closeness. He plans to transition the children to their own beds when the children reach age eleven, if not earlier. Beginning at an unidentified time, Kirby, during time with his children, spent late nights with Robert talking about the latter's frustrations, fears and concerns.

Despite sleeping in the bed with their father, the two children are allotted bedrooms in Kirby's home. The two maintain messy bedrooms.

When Stephen Kirby cares for the children, he allows Robert to play violent video games, including Call of Duty and Fortnite. Robert began playing as early as age six. Sometimes, Robert plays video games all day. Robert once informed a school teacher that he played mature video games at his father's abode twenty-four hours a day, seven days a week. Kirby told the children's guardian ad litem that online games assist Robert, who struggles socially, in gaining friends.

Jodi McMahon worries about the amount and type of video games played by Robert at Stephen Kirby's residence. According to McMahon, Robert has grown addicted to gaming. To the dismay of Robert, McMahon does not allow him to play violent video games at her home.

According to Counselor Brenda Aufderhar, Robert often mentioned video games during visits. Aufderhar believes the games function as a coping mechanism for the boy. Aufderhar opines that Robert plays an excessive amount of video games.

Stephen Kirby permits his children to stay up late on school nights, so long as they timely get ready for school the next morning. When initially residing with Kirby, Robert went to bed, on school nights, between 10:00 p.m. and 1:30 a.m. On weekends, Robert retired to bed as late as 3:00 a.m. after playing video games. Jodi McMahon noticed weariness in Robert when he returned to her dwelling after nights with Kirby.

4

On November 14, 2017, Stephen Kirby filed a request to modify the parenting plan to expand his residential time. Kirby sought equal time with the children. Around the same time, Kirby filed a request to modify the amount he paid in child support for the two children. Unfortunately, most of the records forwarded to this court on appeal concern the motion to modify support, not the motion to modify the parenting plan.

On January 23, 2018, the superior court commissioner entertained Stephen Kirby's motion to, pending trial, change the parenting plan. The commissioner denied Kirby's request for equal residential time on a temporary basis. The commissioner, however, increased Kirby's residential time with Robert and Rebecca from four overnights to ten overnights per month. Under the temporary order, Kirby enjoyed residential time every other week from Friday after school to Monday before school, as well as every Wednesday after school until Thursday before school. The summer break schedule remained the same.

On May 22, 2018, the superior court commissioner assigned guardian ad litem (GAL) Nina Roecks to investigate and report to the court on behalf of the best interests of both children. Some of this opinion's facts arise from two GAL reports by Roecks.

Robert and Rebecca now attend Pioneer School, a Spokane private elementary school. Betty Burley-Wolf serves as the principal of the school. According to Burley-Wolf, Robert frequently spoke, at school, about playing video games at his father's house. Burley-Wolf observed Robert arriving at school, after spending the night at his

father's house, tired and smelling poorly. According to Burley-Wolf, Kirby packed questionable lunches for Robert. One lunch contained a large bag of Cheetos. Another nutritional lunch consisted of red Kool Aide and a big bag of Doritos. A concerned teacher stored tangerines and string cheese for Robert.

Robert's second grade teacher, Amy Wartinger, also smelled a foul odor on Robert and saw a disheveled young boy on mornings after Robert stayed with his father. On one occasion, Robert smelled like feces. According to Wartinger, Robert's condition always improved after returning to his mother's home.

At trial, Stephen Kirby averred that Robert suffers from encopresis, a condition in which impacted stool collects in the colon and rectum and leads to fecal leakage. The condition often arises in children that resist bowel movements.

According to one of Rebecca's school teacher, Sarah Crosby, Rebecca never completed her homework and the incomplete work delayed her learning. Crosby worried that the mother, Jodi McMahon, lacked concern about Rebecca's academic development. McMahon failed to respond to e-mail from the teacher and failed to ask questions about her daughter during school conference meetings.

According to Sarah Crosby, Rebecca also appeared unkempt at school after staying with Stephen Kirby. Rebecca told her teacher that she stayed up late at her father's house.

Stephen Kirby has discussed with Robert the pending dispute between the parents. Kirby told Robert of the former's views of the latter's mother. The father informed the son of upcoming hearing dates and broadcast his prediction of the result of hearings. Kirby asked Robert not to inform his mother about their conversations. Robert told his father that his mother did not believe he and his sister were safe in their father's care. Rebecca sometimes overheard the two males' colloquies.

Guardian ad litem Nina Roecks interviewed the children. Rebecca informed Roecks that she preferred residing with her father over her mother, because more of her friends lived near the father's house. Robert unsurprisingly disclosed that he preferred residential time with his father, because his father allowed him to play video games whenever he wanted. Robert boasted that his father spent $600 on video games for him. Robert said that his father often sleeps, during which time he plays video games. Robert indicated his best moments with his father include his fathering purchasing him items despite his father's anger toward him. Robert lacked good memories with his mother.

One day in mid-December 2018 when Rebecca visited her father's home, Rebecca knocked on the front door of Maggie, a neighbor unknown to Stephen Kirby and Rebecca. Maggie walked a cold Rebecca home. During trial, Kirby explained that, around 5:30 in the evening, Rebecca and a friend rode bikes in the neighborhood. Kirby described neighbor Maggie as over-concerned.

Nicole Bronson, Robert's fourth-grade teacher, also noticed that Robert sometimes emanated an odor that impacted his mingling with fellow students. Robert also maintained long and dirty fingernails. Bronson did not specify on what days Robert appeared unkempt.

In her first guardian ad litem report filed in September 2019, guardian ad litem Nina Roecks highlighted her concern that Stephen Kirby permitted Robert to spend countless hours playing violent and mature video games beginning at age five. At the conclusion of her initial report, Roecks recommended a parenting plan that placed Robert and Rebecca with Jodi McMahon, while granting Kirby weekend visitation every other week. This plan would reduce residential time with the father from the temporary plan entered by the court commissioner in January 2018.

In her supplemental report prepared in April 2020, Nina Roecks lamented that Stephen Kirby continued to allow Robert to play video games at Kirby's home. Roecks met with Kirby after her first report, and, during this second meeting, Kirby informed her that he had set 9:30 p.m. as the children's target bed time on school nights. He allowed the children to retire later on the weekends. If Robert busily played video games, the boy might not go to bed until 1 a.m. on weekends. Kirby insisted to Roecks that he had ceased speaking to the children about the legal dispute and that neither child had asked about the proceeding.

PROCEDURE

Generally, one petitioning for a change in a parenting plan must obtain a court order confirming that the petitioner presents facts supporting a substantial change in circumstances sufficient to justify an evidentiary trial. Because of the limited record sent to us on review, we do not know if this occurred. Regardless, trial proceeded in May 2020.

During trial, Stephen Kirby's counsel asked Kirby to describe his parenting style. Kirby answered: "I manage the kids enough to keep them safe, but I, also, want them to sort of experience stuff." Report of Proceedings (RP) at 514. Kirby clarified that he would not allow his children to engage in obviously dangerous behavior. He added: "I want to educate them in a safe way, and I baby step them into situations that maybe another adult would think is risky, but I have spent time sort of getting them to that point, and I don't find it to be risky." RP at 516.

During his trial testimony, Stephen Kirby analogized Robert's playing violent video games to his playing "cops and robbers" as a child, during which boys shot each other with toy, Nerf guns. RP at 640. Kirby rationalized that the game Fortnite, played by Robert, showed minimal violence and no blood. He opined that the maturity rating on Robert's video games inaccurately gauged the nature of the games.

Stephen Kirby asserted that Robert played video games to cope with possible sexual abuse and other adverse childhood experiences. Kirby denied that Robert was

9

addicted to gaming. When asked whether he agreed with Nina Roecks that Robert played

an excessive amount of video games, Kirby replied: "he could do less and still get much

of his coping." RP at 648.

After reviewing the testimony, the trial court issued a written opinion, in which

she reviewed the seven factors listed in RCW 26.09.187(3)(a) relating to residential

provisions in parenting plans. In ascertaining the first statutory factor of the strength of

the children's relationships with the respective parents, the superior court found that both

children maintained a strong relationship with Jodi McMahon, who primarily cared for

them when they were young. The court further found:

> Ms. McMahon was the enforcer setting rules and guidelines with
> consequences to follow should those be broken. As the GAL testified
> [Robert] believes Mom's house has more rules. The Court recognizes that
> children as young as [Robert] and [Rebecca] need rules and boundaries.
> When Ms. McMahon worked, she hired nannies to help care for them. The
> testimony demonstrated that even when Mr. Kirby worked from home,
> there were nannies that came in and cared for the children part of the time.

CP at 369.

The superior court decided that the children also shared a bond with their father,

but the bond was akin to a friendship, rather than a parent-child relationship. The court

wrote:

> As was testified too [sic] and evidenced through the GAL report, the
> children believe there are not a lot of rules or boundaries set at dad's house.
> *This would include* sleeping in dad's bed, *allowing* [Robert] *to play video
> games 24/7, allowing* [Robert] *to decide his bed time*, not cleaning house
> regularly and allowing [Rebecca] at young age to go play with friends

several houses away, even after dark in mid-December.  The Court has serious concerns that most of the time [Robert] spends at Mr. Kirby's home is in front of a computer playing violent video games.  Even when the school brought it to dad's attention as a concern that [Robert] constantly talked about these games, it did not dissuade Mr. Kirby to limit [Robert]'s screen time.  When the GAL report was written and the GAL raised this issue, Mr. Kirby still did not concede.  Even in testimony, Mr. Kirby did not seem to comprehend the reasons for the GAL's concerns.  It is of huge trepidation that Mr. Kirby testified he recognizes some of the games his son plays are set for mature audiences, such as 17-year-old and higher yet, he is fine that his son was playing these games as young as 8 and 9.

CP at 369-70 (emphasis added).

The superior court expressed concern about the children's hygiene and nutrition based on testimony from the GAL about teacher reports addressing Robert's lunch menus when residing with his father.  The court voiced alarm about Stephen Kirby discussing the status of the case with his children and "trying to sway [Robert] his way even if unintentional."  CP at 370.  The court wrote:

The fact that Mr. Kirby doesn't see the problems with this (even though the Court ordered not to discuss the case) and how it could undermine the relationship that [Robert] has with his mother.  In the long term this could have some negative impacts on their bond.  It also appears from the testimony that Mr. Kirby wants the kids to always think of him as their friend.  He testified he doesn't want to deceive them rather than explain that he is the parent and they should not concern themselves about court stuff while reassuring them that things will be okay.  This is disturbing to the Court.  Parents should protect their children.  Roping them into the litigation only makes it worse for them overtime.

CP at 370.

In reviewing the second statutory factor of any agreement between the parties, the superior court noted that the parties worked together, before litigation, on scheduling time with the children. The court highlighted that Jodi McMahon believed equal residential time precluded consistency and stability for the children.

When reviewing the performance of parenting functions, the superior court discerned that Jodi McMahon, and not Stephen Kirby, possessed needed parenting skills. The court noted that McMahon should insert herself into the children's homework, but she, not Kirby, had begun to supervise Robert's and Rebecca's learning once the school alerted the parents to the children's learning deficiencies. The court found that Kirby failed to perform basic parenting functions such as bathing children, house cleaning, and nutritious meal planning.

Regarding statutory factor four, the superior court observed that the children needed security and stability for emotional development. The children needed boundaries, not independence.

The fifth statutory factor requires a trial court to consider the children's relationship with one another and with other adults and the children's involvement in their surroundings, school, and other activities. The court found that the children were close to their maternal grandmother, who helps Rebecca learn to play the fiddle. Both Robert and Rebecca participated in school activities and sports and had many friends.

Next the superior court weighed the wishes of the parents and reviewed the wishes

of the children as demanded by statutory factor six. Stephen Kirby sought equal

residential time, while Jodi McMahon wanted Kirby's time limited to visitation over

weekends during the academic year. The court observed that Robert wanted more time

with his father, but this wish resulted from his love of video games and the absence of

rules. Rebecca claimed more friends near her father's house and also enjoyed relaxed

rules there. The superior court concluded:

> The Court does not believe based on their ages and mentality that
> they are sufficiently mature to express an independent reasoned opinion
> without influence of fun times.

CP at 372.

The seventh and final statutory factor required the trial court to review Stephen

Kirby's and Jodi McMahon's employment schedules. We already outlined those

schedules.

After analyzing RCW 26.09.187(3)(a)'s seven factors, the superior court entered

the following ultimate findings and conclusions:

> From the evidence presented at trial up until the end of August 2017,
> Mr. Kirby was pretty much a weekend parent not taking his allotted time
> with his children and offering many holidays to Ms. McMahon. While it's
> obvious from testimony presented by Mr. Kirby he loves his children and
> wants to see them however, *structure and boundaries are issues he must
> work on.* Though many witnesses described it as different "parenting
> styles" between Ms. McMahon and Mr. Kirby, the Court does not consider
> a lack of boundaries and structure as a "style." This freedom at their ages
> can cause issues in the future for his children. The Court finds that love for

13

> their child doesn't always make a perfect parent. When designing a
> parenting plan that works in the best interest of the children using these
> factors listed above, Ms. McMahon should be the primary parent.

CP at 372 (emphasis added).

The superior court rejected Stephen Kirby's request for balanced residential time. The court, instead, adopted the temporary parenting plan as the final parenting plan. Thus, the court granted Kirby visitation every other week from Friday after school or 3:00 p.m. until Monday before school or 9:00 a.m. and every Wednesday after school or 3:00 p.m. until Thursday before school or 9:00 a.m. The court further ordered that Kirby and Jodi McMahon rotate main holidays and that, during summer break, the parents have residential time on alternating weeks, from Sunday at 3:00 p.m. until the next Sunday at 3:00 p.m.

The superior court additionally ordered Stephen Kirby to maintain his children's hygiene and to pack nutritional school lunches for them. The court instructed Kirby to cease speaking about Jodi McMahon to his children. The court directed McMahon to ensure that Robert and Rebecca complete their homework.

The parenting plan entered after the 2020 evidentiary hearing concluded that the continuation of the 2014 schedule, with a minor modification, served the children's best interest. The formal findings of fact adopted the superior court's findings embedded in the written decision.

14

LAW AND ANALYSIS

On appeal, Stephen Kirby argues that substantial evidence does not support the trial court's findings of fact. In turn, since the court's conclusions of law rest on the findings, the conclusions also lack support, according to Kirby. Finally, Kirby contends that the trial court abused its discretion by denying his proposed parenting plan allocating equal residential time between Jodi McMahon and him with their children.

Findings of Fact

We first determine whether evidence supported the challenged findings of fact of the superior court. When the trial court weighs the evidence, this court limits its review to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986); *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002). This court does not review witness credibility. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

Stephen Kirby argues that no evidence supports the finding that Robert played video games twenty-four hours per day, seven days per week. Rather, the evidence showed that Robert simply played many video games. We agree that no evidence

presented at trial supports the proposition that Robert literally played games 24/7. The superior court borrowed the term "24/7" from Nina Roecks' report, in which Roecks wrote that Robert's teacher, Amy Wartinger, reported Robert claiming to play video games "'24/7'" when staying at Kirby's house. SCP at 185. The testimony overwhelmingly supports, however, that Robert played excessive violent video games beginning at a tender age. When reviewing the comment's context, the dissolution court did not intend the reader to take the term "24/7" literally. We grant the superior court some literary license when seeking to make a point.

Steven Kirby challenges the sufficiency of evidence behind the finding that he failed to comprehend guardian ad litem Nina Roecks' concerns relating to the amount and genre of video games Robert played. We conclude otherwise. At trial, Kirby minimized the maturity rating of the video games. Kirby discounted the opinions of school staff and Roecks by failing to reduce Robert's time with video games even after Roecks filed her first GAL report. During Kirby's trial testimony, he expressed minimal concern about Robert's consuming pastime.

Steven Kirby next argues that no evidence supports the finding that Robert set his own bed time. He asserts that Robert, by the time of trial, faced a target bedtime of 9:30 p.m. on school nights. We disagree. Contrary to Kirby's argument, substantial evidence supports a finding that he allowed Robert to decide his own bed time. Nina Roecks reported that Kirby allowed Robert to retire, on school nights, between 10:00 p.m. and

1:30 a.m., and that Robert often played video games until 3:00 a.m. or later on weekends. Although Kirby may have eventually instituted a target bed time of 9:30 p.m., Kirby admitted, during trial, that he allowed his son to stay up between 11:00 p.m. and 1:00 a.m. on Saturdays, if Robert desired to keep playing games. Robert reported to Roecks that his father often slept, during which time he played video games, such that Kirby often did not oversee when Robert retired to sleep. Whenever Robert returned to Jodi McMahon's care, he appeared weary. On Thursday, Robert consistently appeared sleepy at school.

Stephen Kirby contends that the superior court based its decision primarily on his apparent lack of boundaries and structure for Robert and Rebecca. He impliedly challenges the finding of a lack of boundaries. Kirby asserts that, while he may have previously instituted few boundaries, the evidence showed that he has since established greater structure for his children. Kirby relatedly criticizes the trial court for imposing its own parenting values when rejecting his proposed evenly split parenting time.

The testimony sufficiently, if not prodigiously, supports the superior court's finding. During his trial testimony, Kirby remarked that, while he wished to protect his children from danger, he also wished to introduce them to situations that other parents might judge risky. In fulfillment of this wish, Rebecca knocked on an unknown neighbor's door on a cold December evening when she rode her bike. Kirby discussed, with Robert, his disputes with Robert's mother, a topic no child should hear. Rebecca

17

overheard some of these conversations. Kirby permitted his children to sleep in the same bed with him. Kirby sent Robert to school a lunch consisting of a large bag of chips and red Kool Aide. Because of the lack of structure, both children arrived at school disheveled. Assuming the superior court imposed its own parenting values on Steven Kirby, the majority of parents and judges share those same values.

Parenting Plan Modification

RCW 26.09.260 governs a modification of a parenting plan. The statute declares, in part:

> (1) Except as otherwise provided in subsections (4), (5), (6), (8), and (10) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child. . . .
> (2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
> (a) The parents agree to the modification;
> (b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan;
> (c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
> (d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan, or the parent has been convicted of custodial interference in the first or second

18

degree under RCW 9A.40.060 or 9A.40.070.

Modification of a parenting plan is statutorily prescribed by RCW 26.09.260. *Bower v. Reich*, 89 Wn. App. 9, 14, 964 P.2d 359 (1997). The moving party must comply with the statute. *In re Marriage of Tomsovic*, 118 Wn. App. 96, 103, 74 P.3d 692 (2003). Under subsection (1) of the statute, the court shall not modify a custody decree or parenting plan unless it finds a substantial change in the circumstances of the child or the nonmoving party, and that modification is necessary to serve the best interests of the child. *In re Marriage of Tomsovic*, 118 Wn. App. 96, 103 (2003). Subsection (2) directs the court to retain the residential schedule established in the parenting plan unless specific enumerated circumstances support modification. *In re Marriage of Tomsovic*, 118 Wn. App. 96, 103 (2003). These subsections apply to major modifications of the residential schedule and establish a preference for stability in the child's living arrangements. *Bower v. Reich*, 89 Wn. App. 9, 15 (1997).

We do not know if, in his petition for modification, Steven Kirby alleged a substantial change in circumstances or that he alleged his requested modification would advance the children's best interest. The parenting plan entered after the 2020 evidentiary hearing concluded that the continuation of the 2014 schedule, with a minor modification, served the children's best interest. The superior court entered no finding of a substantial change in circumstances.

19

Stephen Kirby and Jodi McMahon proceed on appeal as if the superior court, in 2020, addressed a parenting plan for the first time rather than a modification of the parenting plan. McMahon does not argue that the superior court must be affirmed because of the lack of a finding of a change in circumstances. Kirby fails to note the requirements of RCW 26.09.260. He only argues the seven factors found in RCW 26.09.187, which we later quote.

In the context of a child support modification, the superior court generally must find a substantial change in circumstances before modifying the amount. *Pippins v. Jankelson*, 110 Wn.2d 475, 480, 754 P.2d 105 (1988). Nevertheless, the courts will not enforce this rule if the superior court initially entered the support order without independently examining the evidence after a contested hearing. *Pippins v. Jankelson*, 110 Wn.2d 475, 480-81 (1988); *In re Marriage of Schumacher*, 100 Wn. App. 208, 212-13, 997 P.2d 399 (2000). No decision has addressed whether this same rule should apply in the context of a modification of a parenting plan. We observe that the 2014 parenting plan directed the parties to periodically review whether to expand Stephen Kirby's residential time with the children.

We do not consider further whether to affirm the superior court on the basis that Steven Kirby failed to show a substantial change in circumstances. We move to the court's ruling based on those factors governing an initial, but final, parenting plan.

RCW 26.09.002 declares the policy behind parenting plans. The statute reads:

Parents have the responsibility to make decisions and perform other parental functions necessary for the care and growth of their minor children. In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. Residential time and financial support are equally important components of parenting arrangements. *The best interest of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.*

(Emphasis added.)

RCW 26.09.187(3)(a) controls a parenting plan. The statutory subsection

declares:

The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:
(i) The relative strength, nature, and stability of the child's relationship with each parent;
(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
(iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004[2], including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
(iv) The emotional needs and developmental level of the child;

21

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Factor (i) shall be given the greatest weight.

RCW 26.09.191 governs restrictions in parenting plans. No restrictions apply in this case.

This court reviews trial court decisions dealing with the welfare of children for abuse of discretion. *In re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004). A trial court abuses its discretion when its decision is manifestly unreasonable or it exercises its discretion on untenable grounds or for untenable reasons. *In re Marriage of Horner*, 151 Wn.2d 884, 893 (2004). A court's decision is manifestly unreasonable if the factual findings are unsupported by the record, the court bases the decision on an incorrect standard, or the facts do not meet the requirements of the correct standard. *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

*Factor 1 — Nature of Relationship*

We proceed to analyze the evidence in light of each factor found in RCW 26.09.187(3)(a). The first factor considers the relative strength, nature, and stability of a child's relationship with each parent. RCW 26.09.187(3)(a)(i). The trial court found that Robert and Rebecca maintained a strong relationship with Jodi

McMahon, the parent that primarily cared for them since a young age. McMahon generally established the children's rules and guidelines. The relationship between Stephen Kirby and the children echoed a friendship, not a parent-child interaction. The superior court expressed concern over Robert's extensive video game playing, the children's hygiene at school, and the nutritional value of the lunches Kirby packed for Robert. Thus, factor one favors McMahon.

Stephen Kirby does not dispute the superior court's findings on factor one. Rather, Kirby criticizes GAL Nina Roecks' reports for failing to deliver a neutral evaluation and for expressing personal judgments. Kirby challenges the court's use of Roecks' reports because of Roecks' lack of reliance on expert testimony and her omission of commonsense impressions. Kirby claims Roecks failed to ground her recommendations in evidence. We disagree.

Stephen Kirby does not identify any judgmental or personal biased statements placed in the GAL reports by Nina Roecks. Roecks' recommendations arose from her legitimate concerns regarding Kirby's care for the two children. Kirby cites no authority requiring that expert testimony support a guardian ad litem's recommendations.

The trial court did not adopt all of Nina Roecks' recommendations. Roecks recommended that the trial court not modify the original parenting plan, while maintaining Jodi McMahon's primary placement and Stephen Kirby's bimonthly, weekend visitation. The court instead adopted the temporary parenting plan's grant of

weekly, Wednesday visitation to Kirby. Thus, the dissolution court granted a limited

modification of the parenting plan contrary to the guardian ad litem's recommendation.

*Factor 2 — Agreements of the Parties*

The second factor concerns any valid agreements between the parties.

RCW 26.09.187(3)(a)(ii). The parties disagree as to the propriety of equal residential

time. This factor bears no relevance.

*Factor 3 — Each Parent's Past and Potential for Future Performance of Parenting
Functions*

The third factor requires the superior court to consider Stephen Kirby's and Jodi

McMahon's respective potential for future performance of their parenting functions,

while reviewing each party's past performance of these functions, "including whether a

parent has taken greater responsibility for performing parenting functions relating to the

daily needs of the child." RCW 26.09.187(3)(a)(iii). This factor also weighs in favor of

McMahon.

The superior court concluded that Jodi McMahon would be successful in

performing necessary parenting functions, so long as she remained attentive to Robert's

and Rebecca's school work. The court recognized that Stephen Kirby had improved his

performance of basic parenting, but that he needed improvement. The court highlighted

Robert's teacher's references to his malodor on multiple occasions after staying at his

father's home.

24

Jodi McMahon concedes Stephen Kirby improved at ensuring his children regularly bathed, his house was clean, and his children ate nutritious meals. Therefore, Kirby asserts that factor three does not benefit McMahon. Nevertheless, the superior court did not find that Kirby lacked the ability to perform necessary parenting functions, only that he struggles in consistently performing those functions on a daily basis. By contrast, the evidence showed that McMahon consistently cared for the son and daughter a majority of the time with few concerns over a period of years.

*Factor 4 — Emotional Needs and Developmental Level of the Children*

RCW 26.09.187(3)(a)(iv) requires the trial court to consider the emotional needs and development level of the child. The trial court found Stephen Kirby and Jodi McMahon both loved Robert and Rebecca, but the children required stability and boundaries facilitated by McMahon. The stability and boundaries would promote development and meet the needs of the children. This factor also favors McMahon.

The undisputed evidence established that Jodi McMahon set more boundaries for Robert and Rebecca. Steven Kirby reported and discussed the parental disputes with Robert, and Rebecca overheard the comments. This discussion would have impacted the children's emotional development. Robert's counselor, Brenda Aufderhar, reported that Kirby did not support Robert's involvement in therapy, which the trial court could have considered when reviewing Robert's emotional needs.

*Factor 5 — Children's Relationships and Involvement in Their Surroundings*

The fifth factor, listed under RCW 26.09.187(3)(a)(v), relates to a child's relationship with his or her siblings and other adults and the child's involvement in his or her surroundings, school, and other activities. Rebecca likely maintained more friends at her father's residence. Robert delighted in the environment at his father's home because he could lavishly play violent video games, but the superior court reasonably considered this environment harmful. The children functioned better in school when staying with their mother. The siblings were close, and they maintained close ties to their maternal grandmother. This factor also benefits Jodi McMahon.

*Factor 6 — Wishes of the Parents and the Children*

The sixth factor requires consideration of the parents' wishes and the desires of the children, if the child's age permits reasoned and independent preferences. RCW 26.09.187(3)(a)(iv). The parents' wishes conflict. Both children desired more residential time with their father, but the superior court discounted this wish because of the children's age.

Strong evidence supports the trial court's findings that a lack of rules and enhanced freedom present at Stephen Kirby's residence influenced Robert's and Rebecca's desire. GAL Nina Roecks' report indicated that Robert wished for more time with his father in order to play video games whenever he pleased. Robert reported best

moments with his father occurred when he made his father angry, but the father bought him objects anyway. Rebecca maintained more friends at her father's abode.

On the surface, this factor favors Stephen Kirby. We question, as did the superior court, whether this factor should weigh heavily, if at all, in favor of Kirby, however.

### *Factor 7 — Parents' Employment Schedules*

The final factor tasks the court with considering the employment schedules of both parents. RCW 26.09.187(3)(a)(vii). The court found both parties to be self-employed. The factor is neutral.

### *Weight of Seven Factors*

Substantial evidence supports all of the trial court's findings of fact as to each of RCW 26.09.187(3)(a)'s seven factors. Factors 1, 3, 4, and 5 weigh in favor of Jodi McMahon. Factor 6 may help Stephen Kirby, but the strength of the factor wanes in light of the reason for the children's wishes. Factors 2 and 7 are neutral.

RCW 26.09.187(3)(a) provides no guidance to the superior court on weighing the various factors. Although we would likely rule similarly if we were the trial court, our druthers hold no bearing on appeal. We must affirm the superior court if the court exercised its discretion reasonably. It did so. Substantial evidence supported the ruling.

### CONCLUSION

We affirm the superior court's limited modification of the parenting plan.

No. 37891-8-III
*Kirby v. McMahon*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.


_____
Fearing, J.

WE CONCUR:

_____      _____
Lawrence-Berrey, A/C.J.                Pennell, J.